# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉.

## DAVIS v. COMMONWEALTH.

### MARCH 21, 1901.

1. CRIMINAL LAW—*Indictment—Naming the Person Injured—Code, Sec. 3997—Poisoning.*—Section 3997 of the Code, declaring that "where an intent to injure, defraud, or cheat is required to constitute an offence," it shall not be necessary to name, in an indictment, the person intended to be injured, defrauded or cheated, applies to an indictment for an attempt to poison. The word "injure" is more apposite to the offence of poisoning or attempting to poison than to forgery, cheating, and like offences.

2. CRIMINAL LAW—*Evidence—Husband and Wife—Competency—Code, Sec. 3997.*—On an indictment for attempt to poison a person who is named "and other persons," the wife of the prisoner may be called to testify against him that the attempt was directed against her also, as she may be one of the "other persons" not necessary to be named under section 3997 of the Code.

3. CRIMINAL LAW — *Evidence — Husband and Wife—Competency—Acts 1897-'8, p. 753.*—At common law the wife was a competent witness to testify against her husband in relation to offences alleged to have been committed by him upon her, and this rule of the common law was not changed by the act of March 3, 1898 (Acts 1897-'8, p. 753).

4. CRIMINAL LAW — *Circumstantial Evidence — Weight.*—Circumstances which tend to prove an offence, and to connect a prisoner with it, may be given in evidence against him. The test of their sufficiency is that the facts which the jury accept as proved can be reasonably accounted for only on the hypothesis of the prisoner's guilt, that they are consistent with his guilt, and point to it so clearly as to satisfy the jury of it beyond a reasonable doubt.

Error to a judgment of the County Court of Fauquier county sentencing the plaintiff in error to the penitentiary for a term of four years.

*Reversed.*

The opinion states the case.

*J. A. C. Keith* and *R. Walton Moore*, for the plaintiff in error.

*Attorney-General A. J. Montague*, for the Commonwealth.

CARDWELL, J., delivered the opinion of the court.

H. A. Davis was indicted in the County Court of Fauquier county for poisoning a well. Upon this indictment he was tried, found guilty, and sentenced to the penitentiary for a term of four years. He thereupon applied to the Circuit Court of Fauquier county for a writ of error, which was denied, and the case is before us upon a writ of error awarded by this court.

The indictment charges the prisoner with poisoning the well of one Thomas Stewart, by putting therein a certain poison, known as *strychnine*, in order that the water so poisoned might be drunk by the said Thomas Stewart and other persons, with intent to kill and injure the said Thomas Stewart and other persons.

The prisoner demurred to the indictment on the ground that the use of the words "and other persons" was not a sufficient designation of said other persons whose names were well known at the time of the finding of the indictment.

Whether or not the County Court erred in overruling the demurrer, and in refusing to strike out the words "and other persons," depends upon whether or not section 3997 of the Code applies to this case. That section is as follows:

"Where an intent to injure, defraud, or cheat is required to constitute an offence, it shall be sufficient, in an indictment or accusation therefor, to allege generally an intent to injure, defraud, or cheat, without naming the person intended to be injured, defrauded, or cheated; and it shall be sufficient, and not be deemed a variance, if there appear to be an intent to injure,

defraud, or cheat the United States, or any State or county, corporation, officer, or person."

That section was first engrafted upon our system of criminal statutes as sec. 9, chap. 20, Acts of 1847-8, relating to *indictments, presentments, and information, and process thereon,* and has retained the same classification, and without material change or amendment, until the present time. Sec. 3997 of the Code of 1887.

There is nothing, therefore, in the history of the section to limit it, as contended for by counsel for the prisoner, to the offences of forgery, cheating, and the like.

The word injured is more apposite to the offence of poisoning, or attempting to poison, than to the offence of forgery or cheating, and like offences. The County Court did not err in overruling the prisoner's demurrer to the indictment.

After some evidence had been introduced, and it had appeared that the wife of the prisoner was, along with Thomas Stewart and others, accustomed to use and drink the water out of the well alleged to have been poisoned, the wife was introduced as a witness for the Commonwealth, whereupon the prisoner objected to the witness on the ground that the wife was not competent to testify against the prisoner, as the indictment alleged no offence against her person, and she had not been first called in his behalf. The court overruled the objection, and allowed the witness to testify, and this ruling constitutes prisoner's second assignment of error.

Had the indictment charged the prisoner with poisoning the well in question with intent to kill and injure his wife, clearly she would have been a competent witness to testify on behalf of the Commonwealth against the prisoner; and since the provisions of sec. 3997 of the Code, *supra,* applies to the case, the same rule as to the competency of the wife to testify governs as if the indictment named her as the person, or one of the persons, intended to be killed or injured by poisoning the well.

There is nothing in the act of March 3, 1898, Acts of 1897-8, p. 753, in conflict with this view. That act makes husband and wife competent witnesses for and against each other in civil cases, with certain exceptions, and the second section of the act provides that in criminal cases they shall be allowed to testify in behalf of each other, but neither shall be compelled to testify against the other. If either, however, be examined in any case as a witness in behalf of the other, the one so examined shall be deemed competent to testify in such case as well against as in behalf of such other, &c.

The third section provides that neither husband nor wife shall, without the consent of the other, be examined in any case as to any communication made by one to the other while married, nor shall either of them be permitted, without such consent, to reveal in testimony after the marriage relation ceases any such communication made while the marriage subsisted; "provided that this exclusion shall not apply to a criminal proceeding for a criminal offence committed by one against the other, but as to such proceedings the existing rules of evidence shall remain unchanged."

It is plain that it was the intention of the Legislature that the statutory restrictions upon the competency of husband and wife to testify in behalf of or against each other, and upon the revealing in testimony by the one against the other of communications by the one to the other during marriage, or after the marriage relation ceases, shall not apply to proceedings for a criminal offence committed by one against the other, but as to such proceedings to leave the existing rules of evidence unchanged, i. e., as at common law.

It having been made to appear in this case that the prisoner's wife, in common with Thomas Stewart and others, as the prisoner knew, was accustomed to drink the water out of the well that the indictment charges him with having poisoned, the offence is as much against the person of the wife as of Thomas Stewart, and

she was a competent witness against him at common law—1 Greenleaf's Ev., sec. 341; 1 Bish. Cr. Pr., 1151-55; Whar. Cr. Ev., 393: And, there being no abridgment by statute of her competency in this respect, the County Court did not err in overruling the prisoner's objection to her testifying in this case.

During the progress of the trial the attorney for the Commonwealth, in arguing before the court, upon an objection to a question propounded to a witness for the prosecution, stated in the hearing of the jury that Judge Nicol had set aside the verdict in the former trial of this case upon a technical point, but that Judge Nicol hated to do it, to which statement the prisoner by counsel objected, and embodied the objection in a bill of exception made a part of the record.

Such remarks by counsel in the hearing of the jury, although thoughtlessly or unguardedly made, may well be regarded as prejudicial to a fair and impartial trial, but, as the trial judge endeavored to remove all injury to the prisoner by the remarks of the attorney for the Commonwealth complained of, and as this cause of complaint is not likely to arise, if there be another trial in the case, it is unnecessary for us to say more upon the subject.

This brings us to the remaining assignment of error requiring our consideration, which is to the refusal of the County Court to award the prisoner a new trial, on the ground that the verdict is contrary to law and the evidence.

The residence of Thomas Stewart is at or near Meetz station, on the Southern railway, in the county of Fauquier, and the well alleged to have been poisoned by the prisoner is in the rear of the residence, and only about ten feet therefrom, and in the well is a pump known as the "Buck-Eye Pump," which has affixed to it a crooked spout, called a "goose neck," through which the water from the well is pumped out. The persons residing at this residence at the time that this offence is alleged to have been committed were Thomas Stewart, his wife, his two nieces, the pris-

oner's wife, and Lucile Hord, and his nephew, A. Linwood Hord. For about a year prior to October, 1899, the prisoner also lived in the house with Stewart, but in October, 1899, as he and his wife had been unable to get along pleasantly together, he left her at Stewart's and went to live alone over his store, situated about 250 yards from Stewart's residence, and it is not shown that he was on Stewart's premises from that time till the date of the alleged poisoning of the well, except on one occasion, he not being on friendly terms with some, at least, of Stewart's family.

Lucile Hord testifies that on the morning of December 11, 1899, she had a bucket of water in the kitchen, and after using all of it that she could, she threw out the dregs and hung the bucket on the "goose neck" of the pump and pumped it full of water, and, having carried it to the kitchen and placed it on the table, she discovered something in the bucket, whereupon she turned around, threw the water out, and this object remained in the bucket; that she then took it out and found that it was an old bullet—an old army bullet—with a piece of cloth attached to the blunt end, which was whipped around and made a small bag, with some substance in it; that she immediately called her aunt (Mrs. Stewart) to find out what it was; that she said to her aunt, "come here and see what I have found," and her aunt took it in her hands and went out to the well, sat down on the platform, and examined it, but said she could not tell what it was, and called Linwood Hord, who was about twenty yards away, who came up, examined the bullet, and said that he knew nothing about it; that in the meanwhile Mrs. Stewart was pulling the bullet through her fingers, and witness said, "I would not do that, it might be something poison;" and then Mrs. Stewart dropped it out of her hands and said: "Yes, we can't tell what it is; it might be poison, and I am going to have it analyzed;" that the next day it was sent to Dr. Sowers, of Warrenton, to be analyzed, and he pronounced the contents of the sack strychnine.

Mrs. Stewart and Linwood Hord corroborate the statement of

Lucile Hord, and Dr. Sowers states that he found the substance remaining in the cavity of the bullet and sack brought to him by Linwood Hord to be strychnine, then in a "pasty state;" that afterwards, in January, 1900, Linwood Hord brought him a bottle, which he also found contained strychnine, and that the contents in the cavity of the bullet and sack, if it had been taken by five persons, would have killed them.

Nothing whatever was said to Thomas Stewart or the prisoner's wife, who was that morning, December 11, 1899, arranging to move over the store to live with the prisoner, and where she did go and remained, in utter ignorance of the alleged attempt to poison her and the rest of Stewart's family, until after she returned to the Stewart Home, on February 14, 1900, having found that she and the prisoner could not live happily together. While she was living with the prisoner over the store, and during his absence, she requested her brother Linwood to assist her in the store; and in opening some goods that came, and placing them on the shelves, a bottle labeled strychnine, out of which a small quantity had been taken, was found on the shelf, along with other drugs and medicines usually kept in a country store, and some old army bullets and samples of cloth, corresponding with the bullet, and somewhat with the sack alleged to have been pumped out of the well, were found in the prisoner's desk. This is the bottle of strychnine taken by Linwood Hord, upon the suggestion of his sister, Lucile Hord, to Dr. Sowers, and still nothing was said to Mrs. Davis about the alleged poisoning of the well. After Mrs. Davis returned to the Stewart home to live, February 14, 1900, she, as well as Thomas Stewart, were then told of the attempted poisoning, and vigorous steps were taken to work up a case against the prisoner, but he was not indicted until the June term of the County Court, 1900. One or two experiments were made to ascertain how the bullet containing the poison was gotten into the pump, and it was found that it could not have been passed through the "goose neck," but,

by taking it off, the bullet could have been dropped down four or five feet into the pump, and then pumped out through the "goose neck."

It is not necessary that we review in detail the testimony adduced in behalf of the Commonwealth. Conceding that the statement of facts already given may be considered sufficient to warrant the conclusion that the well of Thomas Stewart was poisoned, as alleged, or that there was an attempt to poison it, how is the prisoner to be connected with the offence? Only by the testimony of his wife.

Her statement is that, on the night of December 10, 1899, she was in bed up stairs in her Uncle Thomas Stewart's house, and had been asleep, but woke up about 10 or 11 o'clock and heard the door close at prisoner's store; that she recognized the prisoner closing the door, heard him pull it hard, and heard it when it hung; that she knew it was the prisoner, and afterwards she heard footsteps walk across the porch and come towards the house; thought he was coming up after his clothes, as he kept his clothes up there, and would come at any time after them, and hence she listened for some time, but could not hear anything further, and then a little while after she heard a peculiar noise at the well.

When asked how she recognized these footsteps as the prisoner's, she answered: "I heard him many a time leave the store, and I therefore knew that it was his footsteps that walked across the porch that night. I had heard his footsteps often before, and I knew it was him, and thought he was coming up after his clothes. Afterwards I heard a noise at the well. It was a peculiar noise, but as I did not hear anything further from Mr. Davis, I dismissed it from my mind."

She then admits that the prisoner had not been to the house but once after he left it in the October preceding, and only gives as additional reason for knowing that it was the prisoner whom she heard walk from the store towards the house that two dogs

they had didn't bark, while they were in the habit of barking at
strangers, and she didn't think they would bark at prisoner,
as he had been in the habit of coming there before, and one of
the dogs would follow him over to the store. She further says
that, lying in the bed that night (Dec. 10, 1899), "her face was
to the window right by her head, and one of the glass was broken
out, and also was the lattice broken, and that the store was about
250 yards from the house."

Let it be admitted that it is possible that the witness was
lying in bed with her face at an open window on a winter night,
shown to have been very damp, and during the breaking up of
a hard freeze, and heard the store door, fronting almost opposite
from the house where she was, close, and heard footsteps across
the porch and coming on the ground in the direction of the
house, but could she have known that it was the prisoner? It is
impossible that she could have known it, and, therefore, it was
but an opinion of hers that it was he.

Without considering the testimony going to show that the
dogs were not always at the house, their failure to bark cannot
be considered as evidence corroborating the opinion of Mrs.
Davis. She does not venture an opinion, even, that it was the
prisoner whom she afterwards (how long is not stated) heard
make the peculiar noise at the well, but merely expresses the
opinion that it was the prisoner she heard close the store door,
walk across the porch and towards the house. The hearing of
the door close at the store, the footsteps of some one across the
porch towards the house where Mrs. Davis was, and the failure
of the dogs to bark are absolutely all the facts upon which she
bases her opinion that it was the prisoner whom she heard, and
her opinion is all that there is in the case to connect the prisoner
with the offence with which he is charged.

As to what circumstances are admissible as evidence, the only
rule is that they must tend to prove the offence, and to connect
the defendant with it. They may be remote, or they may be

near; minute, or of large dimensions. All must depend upon the particular case. The test of their sufficiency is, therefore, that the facts which the jury accept as proved can be reasonably accounted for on no other hypothesis than the defendant's guilt; that with the theory of his guilt they are harmonious and consistent, and that they point to it so clearly and distinctly as to satisfy the jury of it beyond a reasonable doubt. 1 Bish. Cr. Pr., secs. 1078-1079.

Mrs. Davis states but impressions or thoughts in her mind upon hearing the store door close, footsteps coming therefrom, and noticing that the dogs did not bark. There is a wide difference between evidence which tends to satisfy an intelligent jury that the accused has perpetrated a crime, and such evidence as merely tends to raise in the mind of the jury a suspicion of guilt. Taking the whole evidence together, it is of a very doubtful and inconclusive character, and plainly not sufficient to warrant the prisoner's conviction. *Brown's case*, 97 Va. 791, and authorities cited.

We are of opinion, therefore, that the County Court erred in refusing to set aside the verdict, and its judgment will be reversed and annulled, the verdict set aside, and the case remanded for a new trial.

KEITH, P., concurring:

I have some doubt as to the propriety of the construction placed upon section 3997 of the Code, but I fully concur in the judgment which the court has directed to be entered in this case.

*Reversed.*