LAKE, Appellant, *v.* WEBBER et al., Respondents.

No. 8757

Submitted November 14, 1947. Decided January 14, 1948.

188 Pac. (2d) 416

Mr. Al Hansen, of Baker, Mr. Forrest C. Rockwood, of Kalispell, and Mr. Paul K. Cooney, of Walla Walla, Wash., for appellant.

Mr. D. R. Young, of Baker, for respondent.

MR. JUSTICE ANGSTMAN delivered the opinion of the Court.

This action was brought to cancel a deed and bill of sale given by Edwin Lake to Percy J. Webber. The complaint alleges in substance that Edwin Lake at the time of signing the instruments was incompetent mentally and that the defendant Percy J. Webber and Ethel Webber, his wife, induced him to execute the instruments by undue influence.

The answers of all the defendants save Rex Flint and his wife, Freda Flint, consisted of a general denial together with affirmative allegations that Edwin Lake and his wife Pearl, prior to her death, considered and treated Percy J. Webber as their son and repeatedly expressed their intention to leave their property to him and alleged that after Percy J. Webber obtained the deed from Edwin Lake he transferred some of the property to the defendant Rex Flint and the defendants Gilliams in conformity with the wishes expressed by Pearl Lake prior to her death. The separate answer of Rex Flint and his wife alleges that the property which they obtained from the defendant Webber was given to them in payment of a promissory note of $1,500 signed by Pearl Lake several years before and made payable to Rex Flint. The reply put in issue the affirmative allegations of the answers.

The record consists of nearly 400 typewritten pages and we shall not undertake to review all of the evidence. The principal facts of the case are summarized in the findings of fact made by the trial judge. Those findings are:

"That Edwin Lake died intestate at Baker, Montana, on January 24, 1945, then of the age of 65 years; that his wife Pearl Lake, died at Baker on October 29, 1944; that Edwin Lake left no wife, issue or parents, and his heirs at law consisted of two living brothers, a living sister and several children of deceased brothers or sisters; that defendant Percy J. Webber was not an heir at law of Edwin Lake but a son of Edwin Lake's sister who is still living.

Defendant Rex Flint is not related to any of the other defendants.

That defendants Gilliams are brothers of Pearl Lake, deceased.

That on November 2, 1944, Edwin Lake filed a petition for the termination of the joint tenancy created between him and his wife, Pearl Lake, on February 14, 1933, upon the real estate owned by them; that thereafter and on December 8, 1944, by a court decree the joint tenancy was terminated and the sole ownership of the real property vested in Edwin Lake.

That for several years before her death Pearl Lake carried on the active management of the business affairs of Edwin Lake due to the fact that he was an invalid afflicted for about 15 years with palsy or Parkinson's disease which caused a considerable shaking of his hands and interfered with his movements; that on November 3, 1944, Edwin Lake executed a general power of attorney to defendant Percy J. Webber to carry on his business; on that morning Edwin Lake instructed Mr. Young, who had been the attorney for Edwin and Pearl Lake for many years, to prepare a deed and bill of sale covering his property; that in the afternoon of that day Edwin Lake signed, executed and delivered to defendant Percy J. Webber a warranty deed to all of his real property ''reserving, however, a life estate and all income and use of all of said property'' during his life. His signature to the power of attorney and deed was witnesed by Dr. Weeks and acknowledged by D. R. Young as notary public. On November 4th the deed was filed and recorded in the office of the county clerk of Fallon county.

That before signing the power of attorney and warranty deed Edwin Lake discussed the same with his nephew, the defendant Percy J. Webber, who then requested D. R. Young to prepare the same; each instrument was read over to Edwin Lake and he signed each of them after indicating that he understood and approved them.

That his hands shook considerably from his affliction and

it was necessary to steady his hand or arm during the signing; that his affliction had not affected his mind or mental faculties and no undue influence was exerted by anyone during the execution of the instruments, and the transactions were fair and free from fraud.

That on November 6th, in accordance with instructions from Edwin Lake and Defendant Percy J. Webber, D. R. Young prepared and read to Edwin Lake a bill of sale of all the personal property belonging to him, including a Chrysler automobile, household furniture and equipment, transferring the same to defendant Percy J. Webber.

That his signature was witnessed by D. R. Young and Roy R. Gilliam, and that he indicated a desire to sign the same after it had been read to him.

That his hands were shaking from palsy and that he was assisted during the signing and that this transaction was likewise fair and free from fraud or undue influence.

That the plaintiff Ernest Lake was present for the funeral services of Pearl Lake conducted at Baker on Otcober 31, 1944, where he remained until November 3rd; that he talked with defendant Percy J. Webber about the power of attorney and went to D. R. Young's office with him the day after the funeral.

That after the power of attorney was signed on November 3rd, Ernest Lake and Percy Webber accompanied D. R. Young to the latter's office where a discussion took place relating to the Lake property. Defendant Percy Webber reported to Mr. Young that Edwin Lake insisted on giving all his property to him; that he felt that Pearl Lake's wishes should be carried out and that a part of the property should go to Pearl's brothers. He inquired whether he could deed some of the property to the Gilliams after it had been conveyed to him by Edwin Lake and was informed that he could.

That Ernest Lake departed for Kalispell on November 3rd and did not return to attend the funeral of Edwin.

That Edwin Lake and his wife went to his family home

in England in 1911 and stayed at the home of his sister, Mrs. Mary Webber, the mother of defendant Percy J. Webber. Percy J. Webber was then about 15 years of age. Edwin and Pearl invited Percy to come to America to make his home with them. This he did about two years later. He remained with Edwin and Pearl Lake from February 1913 until he entered the army in November, 1917. After his discharge from the army in July 1919, he returned to the home of Edwin Lake where he remained until 1921. Defendants Percy Webber and Ethel were married on September 11, 1924. Thereafter they took up their residence at Tacoma, Washington, but visited back and forth with the Lakes frequently ever since. Mrs. Pearl Lake in September 1944, on one of the occasions when Ethel visited the Lakes at Baker, indicated to her how she and Edwin would like their property distributed; that the Lake home was to go to Pearl's four brothers, Roy R., Glen, Walter, and Benjamin F. Gilliam, and a small house to Roy, and the other house on lot 1 to go to Rex Flint in settlement of a note and other obligations. The other property she stated should go to Percy.

That Percy and Ethel Webber arrived in Baker on October 28, 1944, the night before the death of Mrs. Lake. They remained there until February 24, 1945, except that for about two weeks Ethel returned to Tacoma to settle their affairs.

That on November 3rd Edwin Lake was informed by D. R. Young that his wife Pearl had expressed her wishes as to the disposition of her property and he became excited and exclaimed, "Everything goes to Percy. I want Percy to have everything." Edwin was then asked if he wanted to make a will leaving everything to Percy or if he wanted to execute a deed and bill of sale. Mr. Lake then inquired if the will would have to go through court and, upon being informed that it would have to be probated, instructed Mr. Young to prepare a deed and bill of sale to all of the property to defendant Percy Webber.

That on November 9th Percy J. Webber and his wife exe-

cuted and recorded deeds in which they carried out the wishes expressed by Pearl Lake by transferring some of the real estate to the Gilliams and some to Rex Flint, all of which was transferred subject to the life estate of Edwin Lake.

That Edwin Lake also changed the beneficiary of his life insurance policy after the death of Pearl to Ethel Webber, who was paid $3,255 as such beneficiary.

That decedents Edwin Lake and Pearl Lake indicated on several occasions to intimate acquaintances that they expected Percy Webber and Ethel Webber to take care of them and that they would have their property upon their death.

That this intention was carried out by Edwin Lake after the death of his wife, reserving the income from the property during his lifetime; that the naming of Ethel Webber as the beneficiary in Edwin's life insurance policy was part of the plan to have Percy and his wife receive their property.

As conclusions of law the court found that on the death of Pearl Lake, Edwin Lake became the sole owner of the property theretofore owned by them in joint tenancy; that the deed from Edwin Lake to Percy J. Webber and the bill of sale were legal and valid instruments transferring all of the property therein described; that defendants have established by a preponderance of the evidence that Edwin Lake at the time of executing the deed and bill of sale was in full possession of his mental faculties and that no undue influence or influence of any kind was exercised by anyone to induce him to execute them and that they were in conformity with his intention of many years standing, and that the transactions were fair and free from fraud; that by subsequent conveyances the defendant Rex Flint and the Gilliams received good and valid title to the properties described in their deeds.

Judgment accordingly was entered, from which this appeal was taken.

Plaintiff assigns 39 specifications of error. Collectively they present but one fundamental question and that is, is the evidence sufficient to warrant the findings and judgment of

the court? If there be in the record substantial evidence supporting the findings of the trial court, we may not interfere with them or with the judgment of the court based thereon, even though there be a substantial conflict in the evidence. In other words, as we said in Sanders v. Lucas, 111 Mont. 599, 111 Pac. (2d) 1041, 1042: "However, where there is substantial evidence to support the findings, even though the evidence be conflicting, we will not interfere with the judgment and findings of the trial court. While we have the right to determine whether the findings are supported by a preponderance of the evidence (Gibbs v. Gardner, 107 Mont. 76, 80 Pac. (2d) 370; Dalbey v. Equitable Life Assur. Soc. of United States, 105 Mont. 587, 74 Pac. (2d) 432; Clack Co. v. Oltesvig, 104 Mont. 255, 68 Pac. (2d) 586; Missoula Light & Water Co. v. Hughes, 106 Mont. 355, 77 Pac. (2d) 1041), yet we cannot say that the evidence decidedly preponderates against the findings when there is substantial evidence supporting them. Hence, our province is but to ascertain whether there is any substantial evidence to support the findings and conclusions of the trial court."

There is no conflict in the evidence as to the physical condition of Edwin Lake at the time he made the deed and bill of sale and for some years prior thereto. He had for many years been afflicted with palsy, which affected his physical well-being, but the record is replete with evidence that this did not affect his mental condition.

Some of the evidence bearing upon this point may be summarized as follows:

Dr. H. S. Proctor, who knew the Lakes since 1915, lived in the same block with them several years, passed the Lake house every day since and stopped and chatted with Edwin frequently, testified:

"Q. Did you ever hear Ed Lake make any statement as to what he intended to do with his property? A. Yes, sir. * * *

"Q. Just what did you hear Mr. Lake say? A. I don't know as I can recall the very words, but I have heard him

say often that when they were through with everything, it went to Percy.

"Q. Did you hear him make any remark how he regarded Percy? A. Yes.

"Q. What was that remark? A. As their son.

"Q. Did you hear that remark made more than once? A. I can't say as to dates, but during the course of twenty years or so, it was brought up very often, because it was 'Percy this' and 'Percy that.'

"Q. You knew Ed Lake at the time he became ill and developed the shaking difficulty? A. Yes.

"Q. And you have known him up to the time of his death? A. Yes.

"Q. Did that sickness affect his mind? A. I don't think it did. * * *

"Q. What was his mental condition up to the time of his death, when you saw him? A. Well, I thought it was very keen, considering his physical condition."

Mrs. Margaret Proctor, wife of Dr. Proctor, who knew Mr. Lake ever since he became afflicted with the shaking difficulty, testified:

"Q. Did you ever notice any change in his mental condition? A. I never did. * * *

"Q. Did you ever hear Edwin Lake make any statement as to what he was going to do with his property? A. Yes, sir, I have.

"Q. What statement did he make in that respect? A. That the property was all to go to Percy.

"Q. Do you recall hearing him make any remarks about his intentions at the time he was building the Lake theatre? A. Yes, sir.

"Q. What remarks? A. Well, at that time my oldest son was a baby, and I would run in there and visit with them and talk to them, and something was said—I don't just remember, I can't recall the words, that is a good many years ago, and they said about this building making them 'more work' and

like that; and they said: 'We are doing it for Percy.' Everything they did was 'for Percy.'

"Q. That was back in about 1918? A. Yes, sir, our first son was born in November in 1917, and this was sometime right after that, I don't just remember when."

Rev. George E. Meyer, pastor of the Baker Community Church, testified:

" * * * Living across the street from him, I saw him most every day, and I talked with him three or four times a week, and walked with him on the street. I called on him in his home. I talked with him again and again three or four times a week, over that period of time.

"Q. What was his mental condition? A. His mental condition the last time I saw him was as keen as any man's in this room, including my own, if I may be so egotistical.

"Q. Did you ever see him when he was not in good mental condition? A. I have never seen him when I wasn't sure he was in perfect control of his mental faculties—never at any time but what he was; and I saw him the day after the death of his wife.

"Q. And did you talk with him at that time? A. I talked with him; I met him the Sunday afternoon of the day of the death of his wife. I saw him on Monday, the 30th day of October, and talked with him as much as half an hour to forty-five minutes; and when I say 'talk' I mean talk.

"Q. That was the day before his wife's funeral? A. Yes, I was with him part of the time in his home during the funeral service and I was an attendant at the funeral, I saw him November 6th, and dates that have been mentioned again and again—dates in connection with this trial.

"Q. What was his mental condition when you saw him? A. I never saw him but what I didn't think his mind was keen; I have occasion to believe it from various conversations I carried on. I saw him the day before his wife's funeral.

"Q. Did he discuss the fact that his wife had died? A. He certainly did—from the depth of a broken heart. * * * A.

Mr. Lake said that the thing which was nearest to him in his heart and was closest to him as son was Percy Webber, whom he had brought from England to the United States of America for the purpose of being, literally, his son and heir.

"Q. Did he make statements to the same effect more than once? A. Yes.

"Q. When was the last occasion? A. The last occasion when he made the statement to me—that which I have told you, took place the 18th of January, six days prior to his death. He had made statements prior to that time, which were to the same effect. * * * He talked of his property and the way he wanted it to go; and how he come to earn this property and his joy in the possession of it, and looking forward to the time of having moving pictures.

"Q. And I suppose the joy of leaving it to Percy? A. He told me that that was his special—his particular—desire— that was his plan, most definitely. * * *

"Q. Was he an intelligent man? A. He was a very intelligent man, yes, sir. He was a keen business man. * * * I think he had a very keen mind, and a very keen business mind."

Reverend Jane Sheffield Meyer, wife of Reverend George E. Meyer, who is also a duly ordained minister in the Congregational Church, and the official pastor for the Congregational Church at Plevna, testified:

"Q. Did you frequently see Edwin Lake? A. Yes, indeed.

"Q. Did you talk with him? A. I always greeted him and stopped long enough to understand him. I met him most every morning when he was taking his walk. * * *

"Q. What was Mr. Lake's mental condition during the time you knew him? A. Excellent. He had a keen mind and a great humor.

"Q. Did that condition continue up to the time of his death? A. It did, a few days before I saw him last.

"Q. You saw him a few days before his death? A. Yes.

"Q. Up to that time did you ever talk with Edwin Lake and find him not to be in proper mental condition? A. Indeed not. He was always in keen mind.

"Q. Always, apparently, in full possession of his faculties? A. Always in possession of his faculties."

Other witnesses who testified substantially to the same effect were William Harris, Mrs. Charles Pickard, Mrs. Elizabeth Westerfield, Charles Pickard, H. B. French, William Kruckeberg, Dr. S. A. Weeks, Denzil Young, defendant Rex Flint, and defendants Percy and Ethel Webber.

With this array of witnesses testifying to the mental condition of Edwin Lake and the often expressed desire that Percy Webber should have all of the property, we are not at liberty to say that the evidence does not support the findings of the court and the judgment. If the burden was upon defendants to show absence of undue influence, as contended by plaintiff, the evidence is sufficient to warrant the finding that defendants met that burden. The record shows that before the instruments were signed they were read to Edwin Lake and he expressed a desire to sign them. Such evidence came from witnesses other than Percy Webber and Ethel Webber.

Plaintiff contends that Percy Webber made contradictory statements and statements from which the only inference that could be drawn was that he and his wife were the dominating factors in procuring the deed and bill of sale, and that he is bound by such testimony and that the case should be judged from the standpoint of the weakest of his evidence alone, relying upon the case of Casey v. Northern Pac. R. Co., 60 Mont. 56, 198 Pac. 141, and kindred cases. In those cases, however, the evidence of the party was not only contradictory, but it was contrary to physical facts, inherently improbable or unworthy of belief. The evidence of Percy Webber was not subject to these objections. Under such circumstances a new trial will not be granted because of the weakness of the evidence of the successful party (Hinton v. Peterson, 169 Pac. (2d) 333), particularly where, as here, there was evidence from

other witnesses sufficient to sustain the findings and judgment.

The prevailing rule is that a party is not bound by that evidence given by him which is the least favorable to him when he himself gives evidence stronger in his favor and when other evidence supports that in his favor. An exhaustive note appears in 169 A. L. R. 798, treating of this subject.

There the author on page 805 says: "Under the older and prevailing practice, where the more favorable evidence relied on by a party to overcome the effect of his own self-injurious statement is in his own testimony, no distinction is drawn as compared with the situation where the curative evidence is from other witnesses. It is still for the trier of fact to decide the issue upon all the evidence." The author then, on page 807, points out the rule in Georgia and on page 808 states that even there the later decisions hold a party to the version of his case least favorable to him "unless other evidence is introduced which supports the version more favorable to him." The author then on page 809 points out that Montana has adopted the Georgia rule and states that "it is inferable that the Montana court intends the rule to be as finally left by the Georgia court: namely, that if other evidence supports the party he is not concluded by the inadequacy of his own testimony in its weaker aspect." That this conclusion is correct will be seen from the case of Hinton v. Peterson, supra.

This is but an extension of the well settled rule that a party is entitled to have the evidence viewed in the light most favorable to him where there is a conflict in the evidence arising from discrepancies between the testimony of his own witnesses. Hardie v. Peterson, 86 Mont. 150, 282 Pac. 494; Federal Land Bank v. Green, 108 Mont. 56, 90 Pac. (2d) 489; Gohn v. Butte Hotel Co., 88 Mont. 599, 295 Pac. 262; In re Cumming's Estate, 92 Mont. 185, 11 Pac. (2d) 968; Stranahan v. Independent Natural Gas Co., 98 Mont. 597, 41 Pac. (2d) 39.

Finding substantial evidence in the record to support the findings, the judgment is affirmed.

Mr. Chief Justice Adair and Associate Justices Choate, Gibson, and Metcalf concur.