STATE, Respondent, *v.* STORM, Appellant.

No. 8949

Submitted April 26, 1950.   Decided June 28, 1950.

220 Pac. (2d) 674

Mr. W. E. Coyle, Butte, Mr. Philip O'Donnell, Helena, for appellant. Mr. O'Donnell argued orally.

Mr. F. F. Haynes, Forsyth, Special Counsel for State of Montana, Mr. Arnold H. Olsen, Atty. Gen., Mr. Charles V. Huppe, Mr. Louis E. Poppler, Assts. Atty. Gen., for respondent. Mr. Haynes and Mr. Poppler argued orally.

MR. JUSTICE FREEBOURN:

On December 15, 1948, the county attorney of Rosebud county, by information filed in the district court, charged John Storm, defendant and appellant, with having "committed the crime of assault in the second degree, committed as follows: That on or about the 21st day of September 1948, at and within the County of Rosebud, State of Montana * * * John Storm * * * did * * * wilfully, wrongfully, unlawfully and feloniously commit an assault upon Floyd E. Dowlin, a human being, * * * with a deadly weapon likely to produce grievous bodily harm, to-wit: A loaded revolver * * * then and there held in his hand, and that the said defendant did then and there unlawfully, wilfully, wrongfully and feloniously point the same at the said Floyd E. Dowlin and threaten the said Floyd E. Dowlin with said revolver."

Upon trial defendant was found guilty of second degree assault by the jury. Punishment being left to the court, defendant was sentenced to imprisonment in the state prison at hard labor for a term of two years.

The information charged defendant with assault in the second degree as defined in subdivision 4 of section 94-602, R. C. M. 1947. The parts of this section material here are:

"Assault in the second degree. Every person who, under circumstances not amounting to the offense specified in the last section: * * *

"4. Wilfully and wrongfully assaults another by the use of

a weapon, or other instrument or thing likely to produce grievous bodily harm; or,

"5. Assaults another with intent to commit a felony, or to prevent or resist the execution of any lawful process or mandate of any court or officer, or the lawful apprehension or detention of himself, or of any other person, is guilty of an assault in the second degree, and is punishable by imprisonment in the state prison for not less than one nor more than five years, or by a fine not exceeding two thousand dollars, or both.''

The information charged Storm with unlawfully threatening ▆ Floyd E. Dowlin by pointing a loaded revolver at him. This charged a criminal offense.

As was said in State v. Kuum, 55 Mont. 436, 445, 178 Pac. ▆ 288, 291:

''If one person presents a loaded firearm at another, with a purpose to do the other an injury or put him in fear, he is guilty of doing an unlawful act, for it amounts to an assault. State v. Barry, 45 Mont. 598, 124 Pac. 775, 41 L. R. A., N. S., 181; State v. Papp, 51 Mont. 405, 153 Pac. 279.

''But if the pointing of the weapon is accidental, or if there is no purpose or intention to injure the other by putting him in fear or otherwise, the act is not unlawful, in the sense that it is a crime punishable by law.''

Neither would a person be guilty of a crime if he pointed the weapon through mistake, nor would he be guilty of an offense if such pointing was for good cause or reason.

The prosecution introduced much evidence, over defendant's ▆ objection, in attempting to prove that Storm in pointing the firearm, was resisting a lawful arrest by Dowlin as sheriff.

To make this kind of evidence admissible the information should have charged defendant under subdivisions 5 (not 4) of section 94-602, supra.

One witness giving this type of evidence was defendant's wife. Not only was her testimony inadmissible for the reason above stated, but section 94-8802, R. C. M. 1947, specifically prohibited her testimony. This section reads: ''Competency of husband

and wife as witnesses. Except with the consent of both, or in cases of criminal violence upon one by the other, or in case of abandonment, or neglect of children by either party, or of abandonment or neglect of the wife by the husband, neither husband nor wife is a competent witness for or against the other in a criminal action or proceeding to which one or both are parties.''

This statute continues what has long been the common law.

''At common law, and in the absence of constitutional or statutory provision to the contrary, one spouse can not testify for or against the other in a criminal prosecution, except that one spouse may testify against the other as to an offense committed by the latter against the person of the former.'' Underhill's Criminal Evidence, 4th Ed., p. 668.

''Under the common law, which in the absence of statutory modification generally continues in full force, neither husband nor wife is a competent witness in a criminal prosecution against the other unless the crime charged is an offense against the person of the spouse testifying.'' 58 Am. Jur., Witnesses, sec. 175, p. 125.

In Meade v. Commonwealth of Virginia, 186 Va. 775, 779, 43 S. E. (2d) 858, 860, 173 A. L. R. 372, a case wherein the husband was charged with forging the wife's name to a deed of property owned by the wife, the Virginia court, in holding that such act was not an offense committed against the wife within a statute declaring a husband or wife competent to testify in a prosecution for a criminal offense committed by one against the other, in part, said:

''At common law, neither husband nor wife was a competent witness in a criminal action against the other, except where the crime was committed against the one testifying. The test was whether the offense amounted to personal violence or a physical assault upon the other. The exception was based upon the necessities of justice. Stein v. Bowman, 13 Pet. 209, 38 U. S. 209, 222, 10 L. Ed. 129, 135; Bassett v. United States, 137 U. S. 496, 11

S. Ct. 165, 34 L. Ed. 762; Davis v. Commonwealth, 99 Va. 838, 38 S. E. 191.

" 'This rule is founded upon the deepest and soundest principles of our nature, principles which have grown out of those domestic relations that constitute the basis of civil society, and which are essential to the enjoyment of that confidence which should subsist between those who are connected by the nearest and dearest relations of life. To break down or impair the great principles which protect the sanctities of husband and wife would be to destroy the best solace of human existence.' Stein v. Bowman, supra."

Since Storm was not charged with a crime of violence upon his wife, or abandonment or neglect of her or of their children, the wife was not a competent witness against the defendant, her husband, and the admission of her testimony was prejudicial and reversible error.

Since the case must be reversed, we are impelled, after reading the transcript, to go a step further and determine if without the wife's testimony there is sufficient evidence to establish defendant guilty beyond a reasonable doubt of the crime of second degree assault as defined in either subdivision 4 or 5 of section 94-602, supra.

The material facts, as shown by deputy sheriff Davidson's direct and cross-examination are simple: On the late afternoon of September 21, 1948, after receiving a telephone call from the Storm ranch, he told the county attorney "there had been a fight at the Storm ranch." He asked the county attorney for a warrant of arrest and was handed a blank justice court complaint. He then went by automobile with Sheriff Dowlin to the Storm ranch, arriving after darkness had fallen. They entered the ranch house where Davidson handed the blank justice court complaint to Dowlin. In the house they saw defendant's wife, Vivian Storm. "Q. Did she say anything at that time? A. No." When asked if Dowlin talked to Mrs. Storm the answer was, "I believe not." They also saw Dora Mae Chandler,

defendant's sister, in the house. When asked if sheriff Dowlin talked to her "about the things that happened that afternoon," the answer was "No."

All that was done in the house was: "A. As I remember he handed her the paper and said, 'I'd like to have you sign this,' and I believe that's all the conversation they had." "She signed it," and "I picked it up." Neither Vivian Storm nor Dora Mae Chandler asked the sheriff or his deputy "to arrest John Storm." The sheriff did not "before or at the time he left the house" tell his deputy "he would arrest John Storm."

Leaving the ranch house, Dowlin and Davidson, the latter carrying the blank justice court complaint now signed by Dora Mae Chandler, walked in the darkness to the vicinity of a trailer house where Storm was. As they neared Storm, who appeared in the darkness to be "just an image is all I could see," Davidson heard Storm say, "You better not come any further." Davidson was not able to recognize Storm "until he walked down to where we were at." At this time Storm was "leveling the gun at Dowlin."

Dowlin said to Storm, "Johnny, we have a warrant of arrest for you," and "Mr. Dowlin told me (Davidson), he says, 'Give it to him,' so I handed him this piece of paper." Storm took the paper in his left hand and started for the burning lights of a car. As Davidson said: "He was not pointing the gun at anybody * * * after we started" for the car. "* * * we walked down there and just about the time we got to the car Johnny put the gun in here (indicating under his waist belt) and he took the paper in his right hand and opened it like this (indicating) and then he put his hand here like this (indicating on butt of gun in his waist belt) and held that in the light and he says, 'Hell, that's no good. I don't have to go to town * * * '." Whereupon Dowlin struck Storm over the head with his six shooter, "hit him on the side of the head and said, 'Stick your hands up'." Storm at that time, "at the time he was hit," had "the paper in his hands." Storm was "handcuffed right there" and taken to jail.

Since Dowlin had no valid warrant for Storm and Storm had committed no offense in his presence (not considering the crime charged) the only authority under which Dowlin had a legal right to arrest Storm must be found in section 94-6003, R. C. M. 1947. It follows:

"Arrests by peace officers. A peace officer may make an arrest in obedience to a warrant delivered to him, or may, without a warrant, arrest a person—

"1. For a public offense committed or attempted in his presence;

"2. When a person arrested has committed a felony, although not in his presence;

"3. When a felony has in fact been committed, and he has reasonable cause for believing the person arrested to have committed it;

"4. On a charge made, upon a reasonable cause, of the commission of a felony by the party arrested;

"5. At night, when there is reasonable cause to believe that he has committed a felony."

Sheriff Dowlin had no legal right to arrest Storm under the evidence in this case unless he believed John Storm had committed a felony upon Vivian Storm, his wife.

That he did not arrest defendant for this reason or under such a belief is clear. The statements of Vivian Storm were not relied on for any official act.

Davidson, hearing of the trouble between defendant and his wife by phone, felt a warrant was necessary. Neither the sheriff nor his deputy learned or tried to learn any facts from Vivian Storm or Dora Mae Chandler when that opportunity was presented at the ranch house. There nothing was done except to have Dora Mae Chandler, not defendant's wife, sign a blank justice court complaint. Nothing was written into such complaint charging Storm with an offense against his wife. The sheriff made no statement to his deputy that he intended to arrest Storm. Dowlin did not tell Storm he was arresting him for an

offense upon his wife. Instead he said he had a warrant for his arrest which in fact he did not have.

On the following day the justice court complaint filed against defendant did not charge him with an offense against his wife. It charged a crime committed against the sheriff. The information upon which defendant was tried, filed in the district court in December 1948, did not charge defendant with an offense against his wife, but charged him with the offense of pointing a weapon at the sheriff.

In addition, the sheriff testified that he was not ready to arrest defendant before he entered the ranch house.

"Q. You thought it was necessary to go in and have some one sign this paper before you'd make the arrest? A. Yes, sir.

"Q. That's the state of your mind and then all you did after that was to get Dora Mae Chandler to sign that paper before you went out to make the arrest? A. Yes, sir."

He testified further: "Before he saw that paper he started to defy me in saying he wasn't going.

"Q. Sheriff, at the time that you hit John Storm over the head, where was the gun, John Storm's gun? A. It was in my left hand.

"Q. John Storm's gun? A. Yes, sir.

"Q. And then after you disarmed him you hit him with your gun? A. He stood there defying me and said he wouldn't go and I said, 'Get down in that car.'

"Q. And you hit him with a gun when he was unarmed? A. I did.

"Q. Was that necessary? Did he make any resistance to you at that time, sheriff? A. In words he was resisting me all the time.

"Q. What did John Storm say to you after you had the gun in your possession. John Storm's gun in your possession? A. He still defied me and he said, 'This isn't worth a damn and I'm not going to town with you.'

"Q. And for that you hit him on the head with your gun? A. I did."

Defendant, 31 years of age, with an honorable discharge showing service in the United States Army during the last World War, rating of a sergeant, and medals for good conduct, also American and Asiatic-Pacific theater medals, contended that he had trouble that same day with two Texans. When the sheriff and his deputy came toward him in the darkness he believed they were the two Texans and took the gun from the trailer house for protection. He recognized the sheriff when about 12 feet away and put the gun in the waist of his pants when he was handed the supposed warrant.

The evidence is insufficient to warrant defendant's conviction ▄▄▄ upon a charge of second degree assault either under subdivision 4 or 5 of section 94-602, supra.

We believe the jury was influenced in arriving at a verdict of guilty not only by the prejudicial and wholly inadmissible evidence of defendant's wife, but by the fact as appears from the record that after defendant's arrest in this case, his father was charged with a serious offense of violence and in connection with this defendant was arrested upon suspicion, imprisoned for 23 days and released without any charge being filed against him or warrant issued for his arrest.

For the reasons stated the judgment is reversed with directions to dismiss the information.

MR. CHIEF JUSTICE ADAIR and ASSOCIATE JUSTICES METCALF and BOTTOMLY concur.

MR. JUSTICE ANGSTMAN (concurring in part and dissenting in part):

I agree that since defendant was charged with assault in the second degree by the use of a weapon likely to produce grievous bodily harm under subdivision 4 of section 94-602, R. C. M. 1947, evidence that the assault was committed by defendant upon Floyd E. Dowlin as sheriff with intent to prevent or resist the

lawful apprehension or detention of himself as provided in subdivision 5 of section 94-602, was inadmissible.

Defendant was not advised by the information that he must be prepared to defend a charge growing out of the violation of subdivision 5 of that section.

That defendant was prejudiced by the variance between the allegations of the information and the proof there can be no doubt. The record shows the following facts: Floyd E. Dowlin at the time referred to in the information was the sheriff of Rosebud county. Defendant, his wife and children, lived on a ranch about 14 miles from Forsyth, the county seat. On the evening of September 21, 1948, defendant's wife called the sheriff by telephone. Mr. Dowlin was permitted to testify that defendant's wife told him to ''get out here quick. My husband is kicking and beating me and threatened to kill me;'' that she further said that defendant had pressed a loaded revolver against her breast and said, ''Damn you, you're next, I'm going to kill you.'' The county attorney was permitted to testify that defendant's sister, Dora Mae Chandler, called him by telephone on the same evening urging him to have the sheriff go to defendant's ranch, stating in substance that defendant was shooting up the place and threatening his wife with a loaded gun and threatening to kill her unless she would accompany him to Billings. This he in turn communicated to the sheriff's office. The undersheriff Maurice Davidson had also been called by Dora Mae Chandler and he was permitted to testify that she told him substantially the same matter she related to the county attorney. This was all introduced for the purpose of showing that the sheriff had probable cause to arrest defendant without a warrant. Such evidence I agree was inadmissible under the information as drawn.

Whether it would be proper for the wife to testify as to what she told the sheriff in inducing him to make the arrest, had the information been drawn under subdivision 5 of section 94-602, I express no opinion.

I think the judgment must be reversed because of the variance between the allegations of the information and the proof.

I disagree with my associates so far as they hold that the evidence is insufficient to make out a case for the jury under either subdivision 4 or 5 of section 94-602, and in ordering a dismissal of the information.

In viewing the evidence for the purpose of determining whether there is sufficient to make out a case for the jury, contrary to the plan pursued by my associates, we must consider that which is most favorable to the state. This is because the jury must determine the weight of the evidence and whether it is sufficient to show guilt beyond a reasonable doubt. Compare Lake v. Webber, 120 Mont. 534, 188 Pac. (2d) 416, and cases therein cited.

Here if the testimony of Mr. Dowlin is accepted as to what happened—and the jury would have the right to so find—then there is presented no accidental pointing of the loaded revolver at him, nor was there any mistake involved in so doing. If his testimony is accepted then the pointing of the loaded revolver at him was deliberate and intentional and done for the purpose of putting Mr. Dowlin in fear after defendant knew he was the sheriff and not one of the men from Texas referred to in the majority opinion.

When Mr. Dowlin and the undersheriff, Mr. Davidson, approached the defendant, this is what happened according to Mr. Dowlin's testimony: "As I walked up towards the trailer house where I saw John standing, the defendant in this case, I got within about ten feet of him and he pulled, raised up a 38 loaded revolver and told me not to come any closer, and I stopped.

"Q. Wait a minute, you say 'raised it up,' what? A. Aimed it at me, he had it like this (indicating) aimed at me (indicating).

"Q. And said what? A. Not to come any closer.

"Q. Well tell us what was said or what occurred? A. And I

says, 'I have a warrant for your arrest, to take you in,' he says, 'I'll not go in.' He says, 'I'm not going'."

Mr. Dowlin then said he told Mr. Davidson to hand him the paper, which he did. From that time on defendant knew definitely that Mr. Dowlin was the sheriff and not one of the two Texans with whom he had had some trouble.

Mr. Dowlin said that after the paper was handed to defendant, "We walked down around the car there, and all this time he had the six-shooter, the gun, on me, covered all the time and we walked down to where he was going to look at the paper."

Mr. Davidson's testimony was not at variance with that given by Mr. Dowlin when considered in its entirety. He testified that he recognized Mr. Storm at the time he leveled the gun at Mr. Dowlin, and that defendant pointed the gun at Mr. Dowlin after Mr. Dowlin had advised him that he had a warrant.

Mr. Davidson was asked about the gun held by defendant after he handed him the paper. His testimony was: "He held it in his right hand, like this (indicating). [The record does not give us the illustration.] Q. Was he pointing it at anybody? A. Well not after we started at the car; that is I didn't pay too much attention, he was on one side and Whitey was a little bit in front of him."

On cross-examination he was again asked about the relative position of the three as they walked to the light of the car and he testified: "Q. Would you say then that during that time the defendant had the gun pointed at the sheriff and the sheriff was walking in front of him? A. Yes, I would say so. Q. And the gun was pointed at the sheriff? A. Awful close; I would say it was pointed at him."

I think this evidence is amply sufficient to make out a case for the jury that defendant deliberately and intentionally pointed the loaded gun at Mr. Dowlin for the purpose of putting him in fear so as to sustain a conviction of assault in the second degree under subdivision 4 of section 94-602. Also I think if the charge were based upon subdivision 5 or upon both subdi-

visions 4 and 5 combined, see State v. Marchindo, 65 Mont. 431, 211 Pac. 1093, the evidence would support a conviction.

As above noted the information coming to the sheriff about defendant's conduct was given to him over the telephone. There was no occasion or necessity to have the facts repeated at the time Mr. Dowlin arrived at the ranch. The information may come from any credible person. State ex rel Brown v. District Court, 72 Mont. 213, 232 Pac. 201; State ex rel. Wong You v. District Court, 106 Mont. 347, 78 Pac. (2d) 353; State ex rel. Kuhr v. District Court, 82 Mont. 515, 268 Pac. 501. There was ample evidence upon which the jury could find that Mr. Dowlin had reasonable cause to believe that defendant had assaulted his wife with a loaded firearm within the meaning of section 94-6003 sufficient to make an arrest without a warrant. Mr. Dowlin concedes that he had no valid warrant but pretended to have one in order to get the defendant to point his gun .in some other direction.

The fact that defendant told a plausible story about the Texans is unimportant. The jury had and has the right to reject that story as it did in this trial and this notwithstanding defendant's military record so carefully stressed in the majority opinion.

I think the most this court should do is to remand the case for a new trial.