WELSH, Respondent, v. ROEHM et al. (Two Cases) Appellants.

Nos. 9014, 9014A
Submitted October 25, 1951. Decided March 13, 1952.
241 Pac. (2d) 816.

518

Messrs. Hall, Alexander and Burton, Great Falls, for Appellant.

Respondent filed no brief nor made an appearance.

Mr. H. C. Hall argued orally.

MR. JUSTICE FREEBOURN:

John P. Welsh, plaintiff and respondent, and his wife, Katherine Welsh, sued Griff Pritchard and his wife, Dora Pritchard, in separate actions for damages. The two cases were consolidated for trial and the jury returned a verdict for each plaintiff against defendant, Griff Pritchard, each in the amount of $250, as exemplary damages.

On July 16, 1948, Griff Pritchard purchased a house in Great Falls for $4400 cash "not to live in" but for the purpose of fixing it up and selling it at a profit.

A news advertisement for a house, listing a telephone num-

ber, caught his eye. Calling the telephone number, he contacted Mrs. Welsh. The Welshs rented the newly acquired house, paying $65 and the water bill as monthly rental. From this time until April 1, 1949, no difficulty developed between the parties and the rent was paid on the first of each month, in advance. As testified by Pritchard, "There has never been any quarrel between me and the Welshs over money."

On April 15, 1949, Pritchard served the following written notice on the Welshs: "I hereby terminate our verbal rental arrangements from month to month, and request possession May 1, 1949." The Welshs did not comply with such notice and demand.

The notice was insufficient under Montana law to form a basis of a court action to remove the Welshs from the premises, since such notice, the rent having been paid in advance, must be of thirty days duration. R. C. M. 1947, sec. 42-206.

The Welshs made offer of the rent on the first of May and June, which offers were refused by Pritchard, although such rentals reached him by deposit to his credit in the bank. His reason for refusing such rent was: "I did notify the Welshs of the termination of my agreement and I didn't propose to extend that agreement by accepting payment again."

Great Falls was under federal rent control and Pritchard sought an order from such authority permitting him to evict the Welshs, which was denied. Such authority did, however, reduce the rent from $65 to $60 a month.

On June 25, 1949, Pritchard appeared at the Welshs' kitchen door, rapped, walked in and seated himself in the living room. Minutes later his wife, Dora, a paralytic needing assistance of a woman servant, in addition to a crutch and cane, entered the house through the front doorway, Pritchard opening the door for them. Mrs. Pritchard, who seems to have been an innocent victim of circumstances, was seated in one of the Welshs' living room chairs, and there is evidence she did not move from such chair during the day and night of June 25 and 26. A

straight-backed chair, a rocking chair, a radio, some papers and magazines, were moved in. Later a bedstead, springs and mattress were moved in and set up in the Welshs' living room. When asked by Mrs. Welsh what all this meant, Pritchard replied, "We came over to stay."

If Welsh had any idea that his home was his castle, or that he and his family alone would enjoy the privacy and quiet of his domicile, such idea was rudely shattered and took wing when he reached home and found the Pritchards and their belongings cluttering up the living room. Things looked bad and they were to become worse before becoming better. He was in for days and nights that would try any man's soul.

As Welsh entered the living room he apparently did not see his real antagonist, Griff, who was sitting to one side, his cane between his knees. Welsh directed his attention to Mrs. Pritchard and, unmindful of her crippled condition, moved toward her extending his hand and asking her to get out of the chair. Then it was that Griff went into action, impelled by the thought "that he was going to attack my wife." He might have shouted, "Unhand her, villain," but as 72-year-old Griff headed for the 48-year-old Welsh, his words were: "Don't you touch that woman, old man," as he wiggled his cane to gain his balance. Welsh said Griff raised his cane as though to strike him. Then and there, as Griff said, he was "afraid of nothing."

The record does not show Griff's fighting weight, but Welsh was a heavyweight at 195 pounds. Without a shake of the hand and before Griff his guard could raise, Welsh, as Griff tells it, "landed on me with all his might," and Griff went down from the dynamite. Griff hit, not the canvas or the deck, but a small rug upon the floor. As he lay outstretched upon it Welsh skidded it and "rugged" him toward the door. Through the doorway into the porch, where the rug halted, while Griff continued to the lawn, entirely oblivious to what was going on. Returning consciousness left him feeling "as though I had come from the other world."

He was suffering terrific pain in the right shoulder and right side of his chest; his face was bruised, swollen, cut, and bleeding. Already suffering from diabetes, and gangrene in one foot crippling him so he needed a cane to get about, Griff was in poor shape to return to the scene of battle. With difficulty he raised himself from the grass and crept and dragged himself to a sitting position on the front porch. There he sat collecting his faculties and taking stock of the situation when the police officers arrived. No comfort gave they as they stopped to chide, for as Griff put it, "they only asked me two or three or four smart questions and then they went up the steps and through the front door inside."

Griff pulled himself upright, "hung on to the post for a minute," then staggered to the living room again to face his foe.

In that living room he and his wife stayed for 17 days and nights and until July 11, 1949, unwanted guests of unwanted tenants. Griff pulled stakes on July 11, 1949. Just why is not clear, but like the Arab he folded his tent and silently stole away.

The evidence indicates that during his stay in the Welshs' living room a warrant of arrest was served upon him, but to this he paid no attention and he was not arrested. It also appears that a federal court order was served on the Pritchards directing them "to refrain further from using the premises." Then, too, a justice court action was commenced by Welsh seeking the Pritchards' removal from the premises and seeking damages from them. Trial of this action was set for July 12, 1949. No trial was had and that action was dismissed.

Griff, his trials and tribulations not over, found himself defendant in two damage actions brought by the Welshs. On March 24, 1950, a jury in the Cascade county district court, after hearing the evidence on both sides, held that Griff must pay each of the Welshs $250 as exemplary damages, the outcome of his disruption of the Welsh home life during the 17 day and night vigil.

This is the verdict rendered in favor of Welsh: "We, the jury in the above-entitled action do find our verdict in favor of the plaintiff and against the defendant, Griff Pritchard, and do assess him compensatory damages in the sum of $ None Dollars and do further assess as exemplary damages the sum of $250.00 against the defendant, Griff Pritchard."

Distinguished and able counsel for appellant contends that since the jury assessed no actual or compensatory damages against appellant, the verdict for exemplary damages cannot stand.

Further, that if this court, following the decision by Chief Justice Adair, in Fauver v. Wilkoske, 123 Mont. 228, 211 Pac. (2d) 420, 17 A. L. R. (2d) 518, holds that, notwithstanding the verdict, there was undisputed evidence showing actual damage to plaintiff, such as resulting nervousness, loss of sleep and inconvenience, and such award of exemplary damages is thereby justified, in that event, this court may not consider such evidence as a basis for such damages because such evidence is not embraced in, and the trial court limited the consideration of the jury by, its instruction No. 6 to compensatory damages "by reason of the invasion of their right of privacy and the damages, if any, to their nervous system."

Counsel contend that "invasion of their right of privacy" includes only unlicensed publication of names, pictures and other matters of a private nature.

No instruction defining what the court meant by "invasion of right of privacy" was given the jury. Webster's New International Dictionary, Merriam's 2d Ed., defines *invasion* as: "The incoming, or first attack, of anything hurtful or pernicious; as the *invasion* of a disease. * * * Invasion, the most general word, implies a hostile or forcible entrance, intrusion, or encroachment."

*Privacy* means "the state of being in retirement from the company or observation of others; concealment of what is said and done; secrecy." State ex rel. Middleton v. District Court,

85 Mont. 215, 278 Pac. 122, 125, quoting from Webster's Dictionary.

"The right of privacy is often defined as the right to be let alone." 138 A. L. R. 24; 1 Cooley on Torts, p. 449, sec. 135.

"The right of privacy, or the right of the individual to be let ▆ alone, is a personal right, which is not without judicial recognition. It is the complement to the right to the immunity of one's person. The individual has always been entitled to be protected in the exclusive use and enjoyment of that which is his own. The common law regarded his person and property as inviolate, and he has the absolute right to be let alone. * * *" 1 Cooley on Torts, p. 444, sec. 135, quoting from Roberson v. Rochester Folding-Box Co., 171 N. Y. 538, 561-565, 64 N. E. 442, 59 L. R. A. 478, 89 Am. St. Rep. 828.

The so-called "right of privacy," as appellant desires it applied, roots from an article by Samuel D. Warren and Louis D. Brandeis, published in 4 Harvard Law Review, p. 193, in 1890. Its purpose was to supplement and extend man's right to be let alone. It in nowise lessened or detracted from man's right of privacy in his own home, then and now existing.

The general objects as stated by these eminent authorities in the article, are "to protect the privacy of private life" and "It is the unwarranted invasion of individual privacy which is reprehended, and to be, so far as possible, prevented."

Continuing, the article announces: "The common law has always recognized a man's house as his castle, impregnable, often, even to its own officers engaged in the execution of its commands."

The "right of privacy" is embraced within the absolute ▆ rights of personal security and personal liberty. Pavesich v. New England Life Ins. Co., 122 Ga. 190, 50 S. E. 68, 69, 69 L. R. A. 101, 106 Am. St. Rep. 104.

The basis of the "right of privacy" is the "right to be let alone" and it is "a part of the right to liberty and pursuit of happiness * * *." Barber v. Time, Inc., 348 Mo. 1199, 159 S. W. (2d) 291, 294.

524

"The type of cases in which the right of privacy has been recognized vary so widely that it might be concluded that this supposed right is nothing more than a catch-all to take care of the outer fringes of tort and contractual liability, and that it is not the product of any underlying general principle. The typical privacy cases are those involving the display, sale or publication of one's portrait, the public use of one's name, oppressive publicity in connection with the collection of debts, and wire-tapping and other forms of eavesdropping. Superficially, these cases may seem to involve entirely different principles and considerations. Yet, there is a pervading element, common to all the cases, of outraging one's feelings by depriving him of the privacy which most normal persons desire and have a right to demand, whether this deprivation is effected by publishing one's name or picture in an advertisement or by tapping one's telephone line or installing a detectophone so as to listen secretly to one's conversations with family or friends." 138 A. L. R. 25, see annotation.

That Pritchard invaded the privacy and right of privacy of ▇ the Welshs is beyond question. Such invasion, trespass, entry and stay were intentional, wrongful and malicious.

Any detriment or injury suffered by plaintiff from such wrongful acts, entitled him to damage therefor. "Every person who suffers detriment from the unlawful act or omission of another may recover from the person in fault a compensation therefor in money, which is called damages." R. C. M. 1947, sec. 17-201.

"The words 'malice' and 'maliciously' import a wish to vex, annoy, or injure another person, or an intent to a wrongful act, established either by proof or presumption of law." R. C. M. 1947, sec. 19-103, subd. 18.

"In any action for a breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, actual or presumed, the jury, in addition to the actual damages, may give damages for the sake of ex-

ample, and by way of punishing the defendant." R. C. M. 1947, sec. 17-208.

"The method chosen for the protection of rights being an action for the recovery of damages for their invasion, it is manifest that when a party is convicted of the invasion, the conviction must be followed by some consequences disagreeable to himself, or it could not possibly operate as a restraint. As damages are the only penalty which the law provides for the commission of a tort, it is obvious that a recovery of these must be allowed in every case in which a wrong is committed, or those wrongs for which no damages are awarded will be committed with impunity. Subject every man to the necessity of pointing out in what manner a trespass had caused him a pecuniary injury, and for many of the most vexatious there might be no redress and for the rights invaded no protection. Under such a rule the eavesdropper might with impunity invade the privacy of one's home, by listening at keyholes and playing spy at windows, since acts like these, however annoying and reprehensible, could not in any manner tend to impoverish the family, or deprive them of food, or drink, or clothing or diminish their current revenue." 1 Cooley on Torts, p. 90, sec. 46.

"The idea here is, that it is a damage in contemplation of law though followed by neither loss nor pain, because the man's right to personal security has been invaded." 1 Cooley on Torts, p. 91, sec. 46.

The law presumes that the usurpation by strangers, as here, of a man's home, and their continued intrusion for 17 days and nights into the very heart and privacy of his family life, resulted in detriment and damage.

The testimony of plaintiff indicates shocking conditions resulted from such invasion by Pritchard, since all the rooms, with the exception of one bedroom, opened one into the other with no doors between. These rooms included the living room, dining room, one bedroom and kitchen. "One bedroom off the

dining room has a door. Otherwise the house is completely open."

The Welsh family consisted of mother, father, and four children, the eldest fifteen years of age and the youngest eight. Welsh said, "Well, the woman sat in the chair from ten-thirty Saturday morning until about ten o'clock Monday morning; she never moved. No one brought a bed pan for her, and everything she had to do had to be done in the chair. Q. Was it done there? A. Yes, sir. Q. How do you know? A. My wife and everybody saw it. I saw it myself." And later, "They used a bed pan and slop jar." These were dumped off and around the porch. "The odor in the house was terrific. * * * It smelled like an outhouse. * * * One particular evening when we were eating, the contents of the slop jar went across the floor in full view of all of us while we were eating." This made the Welsh family sick.

Later the Pritchards were allowed to use the toilet facilities of the bathroom so that the children would not be "exposed to that type of treatment." Either Mr. or Mrs. Welsh had to remain in the house constantly for fear Pritchard would "slide the bolt on the door and you would be locked out so you just had to stay in and watch the thing all the time. It was just a cold war."

Welsh said he was under a nervous tension. He said: "You can imagine having probably the worst enemy in the world living under the same roof with you. * * * The first two nights he was in there I didn't sleep a wink. * * * He boasted outright he was never going to move out. * * * We were communists. It was his house and we were the trespassers." During the first two nights "It was a case of conversation all night and the expectancy of what might happen, possibly worse than what did happen, and that is the way it continued. * * * Even yet I don't think I have had a decent night's sleep since the guy moved in there. * * * they would get up anytime of the night. We kept the light burning all the time on the back porch so you could see well into the bathroom, and he would flash the

flashlight around and if he felt like it he would get up and assist her to the bathroom.''

The jury was not told it must assess actual damages before exemplary damages were awarded. By instruction No. 7, the court permitted the jury to allow exemplary damages, ''* * * if you find by a preponderance of the evidence that plaintiffs suffered actual damages.''

The presumption is that the jury obeyed instruction No. 7 and did find actual damages before assessing exemplary damages. They could not avoid finding such to be the fact. Exemplary damages were, therefore, properly given. Fauver v. Wilkoske, 123 Mont. 228, 211 Pac. (2d) 420, 17 A. L. R. (2d) 518.

Having found actual damages, why did the jury not assess a money award to compensate for them? There are several reasons which come to mind. One seems obvious. Pritchard counterclaimed for $5,000 for injuries alleged to have been sustained when Welsh struck him and ''rugged'' him from the house. Under the court's instructions the jury could have brought in a verdict for Pritchard on this counterclaim. Without a doubt the jury figured the actual damage as between Welsh and Pritchard was a Mexican standoff and so allowed neither Welsh nor Pritchard an amount of money as compensatory damages.

However, the jury recognizing, and we think rightfully so, the gravity of a stranger invading and destroying the privacy and sacredness of the home, and realizing the serious consequences that can follow it, as punishment and as an example to others assessed exemplary damages.

We have examined the other assignments of error and find no merit in them.

For the reasons stated the judgment of the district court is affirmed.

MR. CHIEF JUSTICE ADAIR and ASSOCIATE JUSTICES METCALF, BOTTOMLY and ANGSTMAN, concur.

No. 9014-A

MR. JUSTICE FREEBOURN:

The facts in this case are the same as those in case No. 9014, John P. Welsh, plaintiff and respondent, v. Griff Pritchard, defendant and appellant, and Dora Pritchard, his wife, defendant, and for the reasons therein stated, the judgment of the district court herein is affirmed.

MR. CHIEF JUSTICE ADAIR and ASSOCIATE JUSTICES METCALF, BOTTOMLY and ANGSTMAN, concur.