STATE, Respondent, v. NICKERSON, Appellant.

No. 9143.

Submitted May 13, 1952. Decided July 30, 1952.

247 Pac. (2d) 188.

158

Mr. Arnold H. Olsen, Atty. Gen., Mrs. Vera Jean Heckathorn, Asst. Atty. Gen., Mr. Bernard W. Thomas, County Atty., Chinook, for respondent.

Mrs. Heckathorn argued orally.

MR. CHIEF JUSTICE ADAIR:

The defendant Clarence Nickerson was charged by information with having committed the crime of assault in the first degree "upon the person of Fred Hochalter with a deadly weapon, to-wit: A loaded revolver, with the intent then and there within him, the said Clarence Nickerson, to kill the said Fred Hochalter." On his plea of not guilty defendant was tried,—convicted of assault in the second degree and sentenced to imprisonment in the state prison for a term of one year. From the judgment of conviction entered against him, defendant has appealed.

*Motion to Dismiss.* In the trial court the defendant was represented by counsel who, following defendant's conviction, caused a transcript on appeal to be filed in this court. Thereafter counsel neither withdrew from the case nor did he file any specifications of error or brief on defendant's behalf. At the time set for the oral argument of the appeal the state interposed a motion for an order to dismiss the appeal because of defendant's failure to file a brief as required by Rule X of this court. At such time counsel who had represented defendant in the trial court represented to this court that he did not oppose the state's motion, informing the court that his failure to file a brief was due to defendant's failure to pay him an

additional fee for representing defendant on the appeal. In view of the foregoing and the fact that a sufficient and timely transcript on appeal has been served and filed herein, the state's motion to dismiss the appeal is denied and the members of this court have taken it upon themselves to carefully read and consider the record on appeal even though such review be without the assistance of either specifications of error, brief or without benefit of oral argument on behalf of defendant.

*On the Merits.* For years the defendant lived and worked alone in the forests of the Little Rocky Mountains in northern Montana where he earned his livelihood cutting timber by hand, making same into logs, poles or posts which, with a team of horses and wagon, he hauled from the mountains to market. As part of his one-man operations defendant established and maintained a camp in the forest near Zortman and another, some 22 miles distant therefrom, located just off the townsite of Hays on the Fort Belknap Indian Reservation.

On the 25th day of January 1951, defendant drove his team and wagon from his camp near Zortman to his home near Hays where he arrived in the late afternoon of that day. Upon such arrival he found that, during his temporary absence therefrom, one George Nicholson, an Indian ward of the federal government, had moved in and taken possession of defendant's home which consisted of a cabin with but a single room,—that Nicholson had stored hay in defendant's barn and that he had turned his horses loose in defendant's feed lot all without defendant's permission or knowledge and against defendant's wishes.

A short time previous defendant's said premises had been looted by unidentified thieves who carted away some 3,000 cut poles together with certain other personal property belonging to defendant. On prior occasions Nicholson had caused defendant considerable trouble by persisting in hanging around defendant's premises and by bringing liquor thereto as a result whereof defendant had ordered Nicholson to stay away from defendant's premises and property. Accordingly defendant was none too happy at finding that Nicholson had moved into de-

fendant's home and that he had taken possession of and was using defendant's barn and feed lot all in defiant disregard of the specific orders theretofore given him by defendant.

Upon finding Nicholson so unlawfully trespassing upon his property defendant again ordered Nicholson to vacate the premises but Nicholson stubbornly insisted on staying, which led to a heated argument, following which defendant put Nicholson out of defendant's home and ordered him to take his horses, feed and himself off defendant's premises and stay away therefrom.

Following such eviction Nicholson went to Hays where he told his troubles to one Fred Hochalter, who, on certain occasions and at the instance of the Indian Tribal Council had acted as a bouncer in overseeing and maintaining order at occasional dances held on the reservation. It also appears that at the time Nicholson moved in and took possession of defendant's home during defendant's temporary absence therefrom, Hochalter was present on defendant's premises and that he stood by and did nothing as he witnessed Nicholson's unlawful entry upon the property.

After telling Hochalter of his eviction, the hostile Nicholson accompanied by Hochalter and riding in the latter's pick-up truck, returned to defendant's home. There, Hochalter alighted from the truck and rapped on the door of defendant's home. In response to such raps the defendant, who was lying on his bed, called "Come in," whereupon Hochalter opened the door, which was unlocked, and entered defendant's home.

The day was cold, the ground was covered with snow and Hochalter was wearing a heavy winter coat and gloves and in a shoulder holster worn beneath his coat and concealed upon his person, he carried a pistol.

On stepping inside, Hochalter observed defendant beside his bed, holding a revolver in his right hand with a table between him and the doorway. Apparently defendant had anticipated that the belligerent Nicholson would return with reinforcements as he did and thus was defendant prepared to protect and defend himself, his home and property from further trespass

or attack by Nicholson or those who should accompany him on his unlawful mission.

At the trial Hochalter testified that upon entering defendant's home he found himself covered by defendant's revolver. On direct examination Hochalter testified: "Well, when I stepped inside, I said 'Hello,' and he say, 'Hello,' you see. Well, I had my coat on, my heavy coat on and my gloves, and I didn't expect anything like that at all, see. * * * A. And so I pulled mine right quickly and ordered him to drop his gun, and * * * I ordered him to drop his gun, and he just dropped it down like that (indicating). Then, I picked it up, and he sat down on the bed.

"Q. Did Mr. Nickerson have his gun in his hand when you first saw him in the cabin? A. Yes.

"Q. And where did he have it pointing? A. Pointing right at me.

"Q. Did you at any time after you had Mr. Nickerson covered, pick up the gun which he had held? A. Yes.

"Q. What did you do with that gun? A. The gun?

"Q. Yes. A. I put that in my pocket and took it home.

"Q. Did you make any examination of it at any time after you had it? A. No.

"Q. Did you look at it to determine whether or not it was loaded? A. Well, I noticed it before; it had four shells in there, yes.

"Q. When did you notice that? A. I noticed that after I got home.

"Q. At any time while you were in the Nickerson's cabin that afternoon, was the gun held by Mr. Nickerson discharged by him? A. No. * * *

"Q. On the afternoon of January 26, 1951, was there any conversation between you and Mr. Nickerson before Mr. Nickerson held the revolver on you? A. No.

"Q. Any words passed between you at all. A. No.

"Q. Were there any words of greeting between you? A. No.

"Q. Did you say 'hello' to him? A. Yes.

"Q. Did he answer you? A. No.

"Q. He didn't make any reply? A. Well, no noise. He just had a funny expression, you know. As far as any noise, I didn't hear any.

"Q. No conversation passed between you? A. No."

On cross-examination Hochalter testified:

"Q. And did you rap on the door? A. Yes.

"Q. Was there snow on the ground? A. Yes.

"Q. And did someone tell you to come in? A. Yes.

"Q. And you opened the door? A. Yes.

"Q. And then what happened? A. I spoke to him, and then I noticed his gun was covering me, see.

"Q. You mean, you said 'Hello,' and he didn't answer you? A. No, he just made—oh, I don't know; he did something like that (indicating), I don't know.

"Q. Anyway, just a groan. A. Yes.

"Q. And he had this gun pointed at you? A. Yes.

"Q. And he never said a word? A. No.

"Q. And he had no reason to shoot you, did he? A. It didn't look like it to me.

"Q. Well, I mean, prior to that time, you never had any words with him? A. No.

"Q. And you didn't tell him you were an officer until after— A. (Interrupting) No, I mean—

"Q. (Continuing) until after you saw the gun? A. After I saw the gun?

"Q. Yes. A. Well, I saw the gun, sure; and I pulled my gun, see.

"Q. But when you rapped on the door, you didn't tell him now— A. (Interrupting) Oh, no.

"Q. (Continuing) You didn't say, Clarence, this is the law, open the door, did you? A. No.

"Q. In other words, he said, 'Come in,' and you walked in? A. Yes.

"Q. And he had the gun on you? A. Yes.

"Q. Held in his right-hand? A. Yes.

"Q. He never said a word? A. No. * * *

"Q. You had an equalizer? A. Yes.

"Q. And you had your coat buttoned? A. He had me covered. I hadn't expected anything like that, see; I wasn't expecting it, you know.

"Q. Did you say anything to him? A. No.

"Q. You didn't say 'please'? A. No, I didn't.

"Q. Well, there's no trouble between you and Clarence Nickerson? A. No.

"Q. He is a peaceful sort of a fellow, isn't he? A. Yes.

"Q. Well, the only reason you went there was to find out what the difficulty was between Clarence and this other fellow? A. Yes, that's right.

"Q. That was all? A. Yes."

The evidence is undisputed that when Hochalter entered defendant's cabin he had no warrant for the arrest of defendant and that he displayed no badge, commission or other evidence of authority to act in the premise.

Defendant testified: "There was no badge showing or anything. * * * I didn't know him or anything about him—who he was or anything." Defendant further testified that he had no intention whatever of either killing or injuring Hochalter and in our opinion this contention is sustained by the record before us. Had defendant intended to shoot Hochalter he had ample opportunity to do so before Hochalter could either unbutton his coat or draw his pistol from beneath.

On his direct examination defendant testified: "Q. Well, how did you happen to have the gun there laying on the bed? A. It's kind of a bad place around there sometimes. You can't tell what's going to happen.

"Q. Are you afraid of this fellow Nicholson? A. I'm a little scared when they get hopped up.

"Q. 'Hopped up,' you mean— A. (Interrupting) When they get hog wild.

"Q. They drink out there? A. Yes."

On his cross-examination defendant testified:

"Q. Did you hear Mr. Hochalter's truck approaching? A. Yes.

"Q. Did you get up from the bed then? A. No, I was there on the bed.

"Q. Did you hear Mr. Hochalter knock on the door? A. Yes.

"Q. Did you tell him to come in? A. Yes.

"Q. And you had your gun in your hand at that time? A. Well, the gun was there, and I picked it up, yes.

"Q. You had your gun in your hand at the time Mr. Hochalter stepped inside the door? A. Well, yes.

"Q. You were standing by your bed? A. No, I was on the bed—lying on the bed. * * *

"Q. You tried to fire the gun when Mr. Hochalter stepped in? A. No, no.

"Q. You intended to do it, didn't you? A. No, I didn't. All I wanted to do was to try to find out what was going on. * *

"Q. Do you hold up everybody that comes into the place? A. Well, I might; *that house is mine.*

"Q. Did you think you had any need of it that day? A. Well, it kind of looked like it, yes. I had lost three thousand poles some way. * * *

"Q. You had your gun pointing at Mr. Hochalter when he entered the cabin? A. I was pointing it at the door, yes.

"Q. And you knew he had to come through the door? A. Well, yes, I knew he had to come through the door.

"Q. You were expecting him to come through the door? A. That's right.

"Q. And you asked him to come in? A. Yes.

"Q. And you were waiting with the revolver? A. Yes.

"Q. You didn't say anything to him? A. What?

"Q. You didn't say anything to him? A. Well I asked him who he was and what he wanted.

"Q. You knew who he was, didn't you? A. What?

"Q. You knew who he was didn't you? A. I didn't know whether he represented the law or not.

"Q. Did you make any effort to lock the door? A. What?

"Q. Did you make any effort to lock the door, or keep Mr. Hochalter out? A. No.

"Q. You didn't try to keep him out? A. I never locked the door, no. I was on the bed at the other end of the table. * * *.

"Q. What did you have it loaded for? A. What?

"Q. What did you have it loaded for? A. I keep it loaded.

"Q. You were ready to use it, weren't you? A. What?

"Q. You were ready to use it, weren't you? A. I was ready, yes. I stay ready.

"Q. Your trouble with Mr. Nicholson didn't have anything to do with your pulling the gun on Mr. Hochalter, did it? A. Well, some, yes. He's got no business letting them Indians bring their stuff in there, and if he is a cop on the Reservation, he should watch that stuff.

"Q. Well, Mr. Nicholson hadn't taken anything away from your place, had he? A. Well, yes, they do.

"Q. Mr. Nicholson hadn't? A. Over across the creek there, poles and stuff sort of kept disappearing."

For years defendant had maintained, possessed and occupied his home near Hays and it stands undisputed that he and he alone had the sole and exclusive right to the possession thereof. At no time did Nicholson have the right to move in or occupy defendant's home or any portion of defendant's premises. At all times Nicholson was an uninvited, unwanted and unlawful trespasser in defendant's home.

Upon Nicholson's refusal to quietly and peaceably leave defendant's premises, defendant forcibly evicted him therefrom as was defendant's right.

The fact that Hochalter was along and that he witnessed Nicholson's initial unlawful entry into defendant's home certainly made Nicholson's trespass none the less illegal. Likewise the fact that Hochalter accompanied Nicholson on the latter's return to defendant's home, following Nicholson's forcible eviction therefrom gave Nicholson no better standing than had he returned alone for he was none the less a hostile, bold and de-

fiant trespasser still stubbornly and without right attempting to intrude himself into defendant's home.

Defendant had committed no crime and Hochalter had no warrant of arrest or other authority to either take the defendant into custody or to require defendant to admit Nicholson to his home as Hochalter well knew when defendant stopped him at the threshold of his home and asked for the authority which Hochalter was unable to produce.

The law of this jurisdiction accords to the defendant the right to keep and bear arms and to use same in defense of his own home, his person and property.

The second amendment to the Constitution of the United States provides that "the right of the people to keep and bear arms, shall not be infringed."

The Constitution of Montana provides: "The right of any person to keep or bear arms in defense of his own home, person and property, * * * shall not be called in question, but nothing herein contained shall be held to permit the carrying of concealed weapons." Art. III, sec. 13, Const. of Montana.

R. C. M. 1947, sec. 94-3527, subd. 14, authorizes: "The carrying of arms on one's own premises or at his home or place of business". See also, Butte Miner's Union v. City of Butte, 58 Mont. 391, 401, 194 Pac. 149, 13 A. L. R. 746.

R. C. M. 1947, sec. 94-605, provides: "To use or attempt or offer to use force or violence upon or towards the person of another is not unlawful in the following cases: * * * 3. When committed either by the party about to be injured, or by another person in his aid or defense, in preventing or attempting to prevent an offense against his person, or a trespass or other unlawful interference with real or personal property in his possession, if the force or violence used is not more than sufficient to prevent such offense."

In State v. Howell, 21 Mont. 165, 169, 53 Pac. 314, 315, this court said: "Under subdivision 3, sec. 404, Pen. Code [now R. C. M. 1947, sec. 94-605, subd. 3, supra], a person in lawful possession of real property may defend it, if he does not use

more force or violence than necessary to prevent a trespass upon or offense against the premises. The evidence shows Howell had been in the peaceable possession of the premises, without any question, for months, as the owner; and he had a right to defend such possession, provided he used no more force than was necessary for that purpose. * * *If a man may not lawfully defend his property, his home, by the use of whatever force it is necessary to use under the circumstances of the case, then he is at the mercy of every tramp, trespasser, or even burglar, who comes along, and enters and takes possession, during his temporary absence therefrom.'' Compare Yarborough v. State, 66 Tex. Cr. 311, 147 S. W. 272; Briggs v. United States, 9 Cir., 24 F. (2d) 961; Rainbolt v. State, 34 Tex. 286.

In Trimble v. State, 57 Tex. Cr. 439, 125 S. W. 40, 42, it is said: ''* * * in order to constitute an assault by alarming a person, the thing done must first be unlawful, must be done in an angry or a threatening manner, and with intent to alarm. There may be an intent to alarm and not be unlawful. A party may be depredating upon my premises. He may be a trespasser. I do not desire to inflict upon him any personal injury; but I desire to act in such manner as would alarm him, and cause him to leave my premises and desist from his mischief. Would an act of mine, though intended to alarm, if there is no intent to injure, be criminal, if injury results from an accident or an unintentional act? We think not. The appellant would have a right to compel parties to leave his premises, and the means that he uses to accomplish that purpose, if not intended to bring about injury, cannot become an assault.''

In Dinan v. Gibbon, 63 Cal. 387, the court said: ''But if the defendant used the weapon 'to resist the encroachment of the plaintiff' as a trespasser on his premises, such use would not be unlawful, unless it was unnecessary. For there is no doubt that a person in the lawful possession of premises has a right to protect them or to eject an intruder upon them; and in the exercise of his right, for that purpose, he may use such force as may be reasonably necessary. Acting within the limits of a

168

reasonable use of force to protect himself or his property he is justifiable in law."

As was said in State v. Yancey, 74 N. C. 244: "We are not left to any speculation as to whether he used too much or too little force; for the result shows that he used just enough to accomplish his purpose. If he had used more he would have injured the prosecutor. If he had used less, and allowed the prosecutor's help to come up he would have lost his property, or engaged in an unequal contest, with probably serious consequences."

The record fails to show that either Nicholson or Hochalter had any right or authority to intrude themselves upon the defendant who was in his own home and attending to his own business as was his right. There is no evidence that the defendant exercised any more force than was necessary "in defense of his own home, person, and property". Art. III, sec. 13, Const. of Montana. Compare: Welch v. Roehm, 125 Mont., 517, 241 Pac. (2d) 816; and State v. Storm, 124 Mont. 102, 220 Pac. (2d) 674.

After a careful consideration of all the evidence presented by the record before us we are of the opinion that such evidence fails to justify or sustain defendant's conviction for which reason the judgment is reversed and the cause is remanded to the district court with instructions to dismiss the information, the remittitur to issue forthwith.

ASSOCIATE JUSTICES METCALF, BOTTOMLY and FREEBOURN, concur.

MR. JUSTICE ANGSTMAN: (dissenting).

I think the evidence was and is sufficient to sustain the verdict and judgment and hence the judgment should be affirmed.

I concede that a person may use or threaten to use force to protect his home, life or property. The difficulty here is to square defendant's acts with any such purpose. He frankly admitted pointing the loaded firearm at Mr. Hochalter and did

so when Mr. Hochalter was 10 or 15 feet from him and just as he entered the door of defendant's home. There was then a table between them. Defendant had no cause to act in defense of himself, his home, or his property. Hochalter had rapped on the door and entered in response to defendant's invitation to "come in." Hochalter neither said nor did a thing to threaten defendant's security in his home, his life or his property.

Defendant did not attempt to justify his actions on the ground that he was defending himself, his home or his property. This theory is first advanced by the majority opinion of this court. Defendant stated his purpose in pointing the gun at Hochalter to be: "I just wanted to get an answer out of him if I could. * * * I just wanted to see if I could scare the truth out of him for once." He was asked, "You weren't afraid of Mr. Hochalter when he came in," and he answered, "Oh, no." He further testified:

"Q. You had no grudge against him [Mr. Hochalter] then? A. Oh, no grudge. I wanted to find out if he had any authority.

"Q. You have to have a gun to find that out? A. Yes, it looks that way.

"Q. You always use a gun whenever you want to find out something? A. It seems like that's a pretty good way to get things going, don't you think?"

That the pointing of a loaded firearm at a person constitutes an assault is well settled. 6 C. J. S., Assault & Battery, sec. 67, p. 921, and cases cited from many states, including Montana.

Hochalter's lack of authority to make an arrest or to take defendant's gun are collateral matters that have nothing to do with defendant's guilt or innocence of the crime here charged. It could have been, and perhaps was, used in a vain attempt to confuse the jury or to arouse prejudice on their part against Hochalter, but has no place for discussion on the issue of the sufficiency of the evidence to justify a verdict of assault.

Likewise the misconduct of George Nicholson has nothing to do with defendant's guilt or innocence of the assault alleged to have been committed against Hochalter.

I think too it should be said that our duty in considering the sufficiency of the evidence, where there has been a verdict of guilty and where a motion for new trial has been denied as here, is to view it in the light most favorable to the state. Here there was evidence that George Nicholson had authority from Tom Kitchen, who was looking after defendant's place at the time, to leave some baled hay on defendant's place. It was the presence of the hay on defendant's premises that caused the difficulty between defendant and Nicholson, together with defendant's suspicion that Nicholson was the one who was stealing his logs. Hochalter testified:

"Q. Well, then, the day before, January 26—or when did you first learn from George Nichols [Nicholson] that there was some trouble between him and the defendant, Clarence Nickerson? A. Well, George Nichols [Nicholson] had some hay there and he had got orders to get his hay out of there; that's how they had the trouble."

Nicholson was not in defendant's cabin when defendant arrived there on the day in question and the record does not warrant the assertion that he had taken possession of defendant's cabin, but his team was in the feed lot and the hay was piled on the premises. Defendant himself testified on that point as follows:

"Q. His team was there when you came home? A. In the feed lot.

"Q. And after you had been there a few minutes, Mr. Nicholson came there? A. Yes."

It is true defendant denied that he intended to kill or injure either Nicholson or Hochalter as stated in the majority opinion. That is undoubtedly the reason why the jury found him guilty of assault in the second degree only rather than in the first degree.

The fact that defendant missed some of his logs at the Zortman operations and the fact that he was annoyed because Hochalter seemingly made no effort to locate the thief furnishes no justification for assaulting Mr. Hochalter with a loaded firearm.

That seems to have been the motivating impulse that prompted the assault and even as to this Hochalter testified that defendant never complained to him that some of his logs had been taken.

I do not find in the record any proof that defendant's premises at Hays had been looted as stated in the majority opinion.

I think on defendant's own statement of his purpose in resorting to the use of the loaded firearm the jury was amply justified in finding a verdict of guilty, and the court properly entered judgment on the verdict and properly denied defendant's motion for a new trial, and the judgment should be affirmed.