514 F.2d 660
 Quentin GILHAM, Sr., Administrator of the Estate of Eileen
Gilham, Deceased, formerly Eileen Schildt, also
known as Evening Star Woman, also known
as Piks- Ah-Ki, Plaintiff-Appellee
v
BURLINGTON NORTHERN, INC., a corporation,
Defendant-Appellant*.
 No. 73-1649
 United States Court of Appeals, Ninth Circuit.
 March 27, 1975
As Amended on Denial of Rehearing May 27, 1975
 
 Cordell Johnson (argued), Helena, Mont., for defendant-appellant.
 J. Allen Bradshaw (argued), Cut Bank, Mont., for plaintiff-appellee.
 OPINION
 Before ELY and HUFSTEDLER, Circuit Judges, and TAYLOR,* District Judge.
 PER CURIAM:
 
 
 1
 This appeal is from a judgment obtained by appellee, an American Indian and member of the Blackfeet Tribe, againt the appellant for the invasion of her privacy by appellant's predecessor in interest, Great Northern Railway Company. During the pendency of this appeal, the appellee died and this court granted a motion to substitute Quentin Gilham, Sr., Administrator of the Estate of Eileen Gilham, deceased, as the plaintiff-appellee.
 
 
 2
 The material facts are not disputed. In 1948 the appellee was 14 years of age and live with her mother in Browning, Montana, which is on the Blackfeet Indian Reservation new Glacier National Park. Prior to and during the year 1948, an artist by the name of Winold Reiss maintained a studio in Browning and while there painted portraits of various members of the Blackfeet Tribe. In the summer of 1948, the artist painted the portrait of the appellee.
 
 
 3
 In December 1948, Great Northern Railway ("railway"), appellant's predecessor, purchase several Indian portraits from artist Reiss, including the one of appellee. The contract between Reiss and the railway required the prior written consent of Reiss before second reproduction rights could be authorized for any of the portraits.
 
 
 4
 Great Northern obtained a copyright for the portraits it purchased from Reiss, including the portrait of appellee without her consent or knowledge. A copy of appellee's portrait was published on the Great Northern calendar for the year 1954; a copy thereof was included as one of a series of Blackfeet Indian portraits contained in a portfolio which was published in 1958; and a copy appeared on the railway's menu and playing cards. In 1953 a representative of the railway, a Mr. Hagen, contacted the appellee, who was then 19 years of age, in Browning, at which time the use of her portrait and biography on the 1954 calendar was discussed. At that time, appellee expressed no objection to the use of her portrait and biography for such purpose and Mr. Bradshaw did not request her consent to do so. Appellee never, at any time, requested compensation from the railway to use her portrait and none was ever offered or paid to appellee by the railway. The railway used the appellee's portrait and name in various ways and places for several years subsequent to 1954 for promotional and advertising purposes.
 
 
 5
 The evidence shows that appellee first saw her portrait in 1954 on the 1954 calendar, that she saw her portrait on a menu in a Great Northern dining car in 1957, and that she purchased canasta cards with the picture on them in 1955. The record discloses that appellee did not do anything by way of objecting or protesting to the use of her picture by the railway until she filed this action against the appellant in April 1972, subsequent to the publication of an issue of a periodical known as Fate Magazine in August 1970 which had a likeness of appellee on its cover. The magazine contained an index of articles and a list of persons involved in producing it. In addition, this language appears: "Cover Photo: copyright 1958 Great Northern Railway Company." A cover story is entitled "The Crow Woman Who Died for Love" by Paul A. Hunt.
 
 
 6
 On June 29, 1960, a Mr. J.M. Hagen, Assistant Advertising Manager for Great Northern, sent several copies of the Reiss Indian portraits, including a copy of the portrait of appellee, to a Mr. L. Taylor Hansen. In the letter of transmittal, Mr. Hagen gave permission to reproduce one or more of the portraits in Fate Magazine, provided suitable credit line was given and that it was cleared with Mr. Tjark Reiss of Philmont, New York. The letter states that Winold Reiss died in the east on August 29, 1953. The letter of transmittal and the August 1970 issue of Fate Magazine (Exhibits 4 & 5) were admitted into evidence over the objection of appellant.
 
 
 7
 At about the same time this action was commenced in April 1972, appellee, through her lawyers, filed a similar action against the publishers of Fate Magazine.
 
 
 8
 At the conclusion of appellee's evidence, the motion of appellant for a directed verdict was granted as to counts two and three of appellee's complaint and denied as to count one, the tort claim for invasion of privacy. The case was submitted to the jury only on count one and the jury returned a verdict in favor of appellee in the sum of $12,500. Appellant filed posttrial motions for judgment notwithstanding the verdict or, in the alternative, for a new trial, which motions were denied.
 
 
 9
 The portrait is a handsome and dignified painting of appellee as a young girl. She willingly posed for it, and she was well aware of the widespread public display of the painting and copies of it over a period of many years. She made no objections to any of these displays until the Fate publication. Her privacy action is based not upon a claim that any public display of her portrait invaded her privacy, but upon her contentions that she was entitled to be compensated for the railroad's use of her portrait in advertising the railroad and that the railroad, by consenting to Fate's publication of the portrait, became liable on the privacy theory for the publication by Fate of the portrait in a setting that offended her sensibilities.
 
 
 10
 Of the multiple torts that have emerged from the right of privacy concept, the two involved in this case have been widely accepted: The unauthorized use of a person's name and likeness for advertising purposes and the unauthorized and unprivileged portrayal of a person under circumstances that would be likely to offend a person of ordinary sensibilities. (E.g., Leverton v. Curtis Pub.Co., 192 F.2d 974 (3d Cir.1951); Strickler v. National Broadcasting co., 167 F.Supp. 68 (S.D.Ca.1958); Briscoe v. Readers Digest Ass'n, Inc., 5 Cal.3d 529 93 Cal.Rptr. 866, 483 P.2d 34 (1971); cf. York v. Story, 324 F.2d 450 (9th Cir.1963).) Montana has given some indication that it will recognize the existence of a tort based on the invasion of privacy concept, but the nature of the tort or torts that it recognizes is as yet ill defined. (See Welsh v. Roehm, 125 Mont. 517, 524, 241 P.2d 816, sub nom. Welsh v. Pritchard, 125 Mont. 517, 241 P.2d 816, 819 (1952) (landlord's intrusion into tenant's home); State v. Brecht, 157 Mont. 264, 270-71, 485 P.2d 47, 51 (1971) (wire taping).) We accord substantial deference to the district court's interpretation of the law of the state in which he sits. However, the district court did not expressly rule on the key legal questions relating to Montana's invasion of privacy law because throughout the trial there was confusion between the two different kinds of conduct upon which the appellant's liability was based: (1) the railroad's publication, use, and distribution of appellee's portrait to advertise the railroad (the brochures, cards, calendars, and menus), and (2) the railroad's permission, as copyright-holder, allowing Fate to publish the portrait.
 
 
 11
 Appellant does not dispute that under Montana law appellee had a cause of action for invasion of privacy based on its use of her portrait for advertising purposes, if she did not consent and if her claim was not barred by limitations. Although appellant quarrels slightly with the court's instructions to the jury on the limitations and consent issues as they applied to the first aspect of the case, its primary ammunition is saved for is attack on these items as they were applied to the second phase of the case. We perceive no reversible error in connection with the trial of the first segment of the case.[1]
 
 
 12
 The impact of the challenged jury instructions on the question of the railroad's liability for the Fate publication is very different. Appellant insisted throughout the trial that it could not be held liable for invading appellee's privacy by reason of its act in giving permission to Fate's publishers to use appellant's copyrighted portrait of appellee. The August 1970 issue of Fate had appellee's portrait on the cover in connection with a story entitled "The Crow Woman Who Died for Love." The evidence revealed that the story involved an entirely different person from appellee. There is no evidence that Great Northern and any knowledge of or furnished any information for the story that appeared or that it knew that a likeness of appellee was going to be used in connection therewith. The record shows that it was this publication that caused appellee to institute this action against appellant in April 1972, as well as a separate action against Fate Magazine.
 
 
 13
 We assume for the purpose of this opinion that the publisher of Fate would be liable on the privacy theory for its publication of appellee's portrait in connection with a fictionalized cover story what was likely to offend a reasonable person's sensibilities.[2]
 
 
 14
 However, appellant did not participate in the editorial processes of Fate. It did not publish the portrait or the story. Its role was limited to giving permission to Fate's publisher to use the portrait if it gave the railroad a credit line as holder of the copyright. Appellant may have been negligent in giving its permission (Restatement (Second) of Torts Sec. 303 (1965) ), but its permission did not invade appellee's privacy. Moreover, there is no predicate in the record for imposing vicarious liability on the railroad for Fate's actions.
 
 
 15
 The railroad may nonetheless be liable for publication of the portrait in Fate if the railroad was using the portrait for advertising purposes. We are unable to say as a matter of Montana law whether an acknowledgement of this kind is or is not within the ambit of advertising for the railroad.[3] The district court did not address itself to this question. If it did constitute an advertisement, however, liability of the railroad would be confined to whatever damage appellant suffered by reason of the railroad's continued exploitation of her likeness for advertising purposes. It would not thereby become liable for damages that she suffered as a result of the use of her portrait in conjunction with the fictitious story that Fate printed.
 
 
 16
 Because of the confusion of the permission and advertising phases of the case, the jury instructions were inadequate and erroneous in respect of consent, limitations, damages, and the definition of invasion of privacy. Upon retrial, both parties will have an opportunity to put the record in order.
 
 
 17
 Reversed and remanded.
 
 ELY, Circuit Judge (dissenting):
 
 18
 I respectfully dissent.
 
 
 19
 My review of the entire record convinces me, beyond doubt, that the jury legally and reasonably could find the railroad liable for the commercial expropriation of Mrs. Gilham's likeness in connection with the 1970 publication of her portrait in Fate magazine. Consequently, I firmly believe that the jury's verdict, and the judgment entered thereon, should stand.
 
 
 20
 The letter of June 19, 1960, from the railroad's assistant advertising manager to a representative of Fate magazine quite obviously granted the magazine's publishers a license to reproduce the railroad's copyrighted portraits of Mrs. Gilham. From the evidence the jury very reasonably, in my opinion, concluded that, without the license, the magazine would not have printed the portraits.
 
 
 21
 Further, the jury could reasonably have found that when the railroad's advertising manager sent the portraits and the license to the magazine, he acted with knowledge, and, perhaps, even with the deliberate intent, that the magazine would publish thousands of copies of the portraits and distribute them widely. I think that it would have been quite proper for the jury to have concluded from the whole evidence that the actions of the railroad's employee were taken as a part of an overall campaign by the railroad to associate the Indian woman's portrait in the public mind with the Great Northern Railway and therefore to promote the railroad's business image through widespread distribution of the portrait. Unlike the majority, I see no real distinction between the railroad's use of Mrs. Gilham's portrait on menus, playing cards, and calendars and its giving a license for publication of the portrait in a magazine, with a credit line to Great Northern Railway.[1] My view as to the relevance of the magazine portrait fits well within the scope of Mrs. Gilham's pleadings below. In the first sentence of her complaint, she charged that "[t]he defendant has, for a number of year, continuously and still is, using the portrait made of the plaintiff .. for purposes of increasing the defendant's trade, commerce and financial gain."[2]
 
 
 22
 I would affirm.
 
 
 23
 kORDER
 
 
 24
 The Petition for Rehearing is denied.
 
 
 25
 Judge Ely would grant the Petition.
 
 
 26
 The court does not consider the suggestion for en banc rehearing because of the appellee's failure, in making such suggestion, to comply with this court's Rule 12.
 
 On Petition for Rehearing
 
 
 *
 Honorable Fred Taylor, District of Idaho, sitting by assignment
 
 
 [1]
 The parties agree that the applicable limitation period is three years under Revised Codes of Montana Sec. 93-2605(3) (1947). The record shows that some use may have been made of the portrait for advertising purposes after April 12, 1969, within the limitations period. On remand the trial court will be able to reconcile its apparently conflicting instructions on whether there must be affirmative acts by the railroad within the period, or simply discovery by plaintiff of the wrong
 
 
 [2]
 We do not decide the question; it is not before us, and the decision may involve some difficult legal issues. Cf. Gertz v. Welch, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); Time, Inc. v. Hill, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1966)
 
 
 [3]
 If, as a matter of Montana law, the publication of the credit line, upon which the railroad's consent was conditioned, was not advertising, the disputed letter was inadmissible because it was irrelevant to the invasion of privacy theory upon which the case was tried
 
 
 [1]
 The majority directs in its footnote 3 that, on remand, the district judge must specifically find that the credit line to Great Northern constituted advertising under Montana law before he admits into evidence the advertising manager's letter. I think that that finding is implicit in the district judge's decision in the original trial to admit the letter and the copy of Fate magazine. In any event, I believe that the district judge in making his decision, on remand, may properly look not only to the credit line but also to the full text of the advertising manager's letter and to the railroad's overall purpose for purchasing the copyright to the portrait, as well as the logical inferences that might reasonably be drawn therefrom
 
 
 [2]
 The fact situation presented to the jury in this case was not wholly new to Montana law. In Bennett v. Gusdorf, 101 Mont. 39, 53 P.2d 91 (1935), the Montana Supreme Court invoked a theory of quasi-contract to impose liability on a photographer who, having taken the plaintiff's photograph, furnished the photo to a third party who displayed the photo in business establishments in connection with a promotional scheme from which the photographer and others were to benefit. The case apparently was argued to the Montana Supreme Court on an invasion of privacy theory; however, the court reserved the question whether Montana law recognized a "right to privacy," a question the Montana court has since answered in the affirmative. Welsh v. Roehm, 125 Mont. 517, 241 P.2d 816, sub nom. Welsh v. Pritchard, 125 Mont. 517, 241 P.2d 816 (1952)