No. 12988

IN THE SUPREME COURT OF THE STATE OF MONTANA

1975

THE STATE OF MONTANA, ACTING BY AND THROUGH
THE DEPARTMENT OF HIGHWAYS OF THE STATE OF
MONTANA,

Plaintiffs and Appellants,

-vs-

HY-GRADE AUTO COURT, a Dissolved Montana
Corporation; RONALD C. WHITE; VENETA WHITE;
GLYNORA J. WHITE, as Statutory Trustees of
the Hygrade Auto Court, a Dissolved Montana
Corporation; RALPH E. MOORE, INC.,

Defendants and Respondents.

Appeal from:  District Court of the Sixth Judicial District,
Honorable W. W. Lessley, Judge presiding.

Counsel of Record:

For Appellants:

Daniel J. Sullivan argued and James Driscoll argued,
Helena, Montana

For Respondents:

Holter, Heath and Kirwan, Bozeman, Montana
Robert M. Holter argued, Bozeman, Montana
Berger, Anderson, Sinclair & Murphy, Billings,
Montana
Richard W. Anderson argued, Billings, Montana
Yardley and Yardley, Livingston, Montana
Dan Yardley appeared, Livingston, Montana
Huppert and Swindlehurst, Livingston, Montana
Arnold Huppert Jr. appeared, Livingston, Montana

Submitted: December 8, 1975

Decided: FEB 18 1976

Filed: FEB 18 1976

Thomas J. Kearney
Clerk

Mr. Chief Justice James T. Harrison delivered the Opinion of the Court.

This is an appeal from a condemnation jury verdict and judgment entered in the district court, Park County.

Hy-Grade Auto Court, is a dissolved Montana corporation holding fee title to service station property in Gardiner, Montana. The stockholders and successors to Hy-Grade are Veneta White, Ronald C. White (her son) and Glynora White (his wife), they will be collectively referred to herein as "Owner". Ralph E. Moore, Inc. leases the service station property from the Owner, and has leased it for many years. This corporation will be referred to as "Lessee". There is a sublessee who actually runs the service station, but he is not a party to this action.

The Montana Department of Highways, (State), filed this condemnation action in the process of upgrading U. S. Highway 89 and the bridge crossing the Yellowstone River in Gardiner.

The subject property is known as the Northgate Texaco station and is the prime service station site in Gardiner. The property is located on the "swing corner", meaning it has good visability in all directions and good access. The highway forks at the station, one fork going to Jardine, Montana, and the other crossing the Yellowstone bridge, and leading to the North Entrance of Yellowstone National Park. Virtually all visitors to the Park, entering and leaving at Gardiner, pass the site of the station. The station pumped over twice as much gas as any other station in Gardiner.

After the taking, the land left available to the Owner would not be sufficient nor suitable for a service station site. All improvements on the property were taken by the State, either as right-of-way, or for the construction easement.

Lessee had leased the property from the Owner since 1964, in fact, since it was built in 1948 (under the present owner and

and its predecessor in interest). The lease in effect at the time of this action was dated February 1, 1968, and provided for a ten year primary term with two additional five year renewal terms. At the time of trial, the lease had 14 years to run.

Lessee also operates as a distributor for Texaco. It services Northgate Texaco and eight other Texaco service stations in the Livingston-Gardiner area.

Prior to the jury trial, the State requested a bifurcated trial, that is, in the State's view, the jury would first decide the total value of the property taken (as though owned by one person), subsequently receiving evidence as to the value of each interest in the whole; deciding this question in a separate deliberation. The district court conducted a single trial, permitted the introduction of evidence on the total value of the property, and the values of the two interests. The jury was instructed to arrive at a total value first, and then apportion that award between Owner and Lessee, all during one deliberation.

At trial defendants' expert witnesses testified to the total value of the property, ranging in their estimates from a high of $135,000 (an estimate by the Lessee) to a low of $100,000 (an estimate by a Texaco land appraiser). The two appraisers testifying for the State gave estimated values of $41,200 and $38,950.

The jury returned this verdict:

"We the Jury, duly impanelled, reach our verdict in the above-entitled Cause, as follows:

"1. For the value of the land and buildings actually taken, the sum of $100,000

"2. For the damage to the land remaining after construction, the sum of $_____

"3. Total owing to both Defendants (total of the above Two (2) figures, the sum of $100,000

"Out of the total compensation awarded to both
Defendants, as above stated, we further break
the award down between the Defendants, as follows:

"1.  To Defendant, Ralph E. Moore, Inc.,  as Lessee,
the sum of                                    $ 50,000

"2.  To Defendant, Hy-Grade Auto Court
the sum of                                    $ 50,000"

Judgment was entered on the verdict October 4, 1974.

The judgment allowed interest, to Owner and Lessee, from the

date of the preliminary order of condemnation, June 19, 1973.

The State appeals from the jury verdict and judgment.

Three issues are presented by the State for review:

1.  In an eminent domain action, what is the proper pro-
cedure to be followed at trial to conform to the statutory re-
quirements of section 93-9912(5), R.C.M. 1947?

2.  Whether both the lessor and the lessee of the property
being condemned are entitled to introduce their respective income
figures as foundation for the income approach to determine the
value of the property being taken?

3.  In an eminent domain action, does the interest on
the judgment run from the date of the preliminary order of con-
demnation or from the date possession of the property to condemnor
is granted by the court?

We consider the third issue first.  Section 93-9913,
R.C.M. 1947, provides:

" * * * If an order be made letting the plaintiff
into possession * * * the full amount finally
awarded shall draw lawful interest from the date
on which the property owner surrenders possession
of the property in accordance with the terms of
such order. * * *"

The order and judgment of October 4, 1974, set interest

from June 19, 1973, the date of the preliminary order of condem-

nation.  This date is clearly erroneous, as the State did not take

actual possession of the property until early 1974.  The order,

signed by Judge Shanstrom, granting the State possession of the

- 4 -

property was dated February 11, 1974.

We direst the district court to correct the order and judgment of October 4, 1974, to indicate interest on the award running from February 11, 1974 pursuant to section 93-9913, R.C.M. 1947.

The State asks this Court to interpret the procedural requirements for eminent domain proceedings as set forth in section 93-9912(5), R.C.M. 1947:

> "5. Where there are two (2) or more estates or divided interests in property sought to be condemned, the plaintiff is entitled to have the amount of the award, for said property first determined, as hereinbefore stated, as between plaintiff and all defendants claiming any interests therein; thereafter in the same proceeding the respective rights of each of such defendants in and to the award shall be determined by the commissioners, under supervision and instruction of the court, and the award apportioned accordingly."

This provision is made applicable to jury trials on appeals from a condemnation commissioners' ruling by section 93-9915, R.C.M. 1947.

The State suggests California case law for construction of the Montana statutory provision. California Code of Civil Procedure §1246.1 is similar to section 93-9912(5), R.C.M. 1947, with any differences irrelevant to the issue at hand. This Court has long held that where a statute is similar to one in a sister state, we will give consideration to the construction placed on that statute by the courts of the sister state; but such construction is not binding upon this Court. Cahill-Mooney Const. Co. v. Ayres, 140 Mont. 464, 373 P.2d 703.

Section 93-9912(5), R.C.M. 1947, was enacted, in its present form, by Chap. 234, Laws of 1961. For 14 years the courts of Montana have construed the statutory provision to mean the award of all the parties must be determined before any apportionment is made among the parties. This procedure, used in the instant

case, was applied by the court and jury, without reversal or modification, in these cases: State Highway Comm'n v. McGaffick, 144 Mont. 76, 394 P.2d 174; State Highway Comm'n v. City Service Co., 142 Mont. 559, 563, 385 P.2d 604; State Highway Comm'n v. Crow, 142 Mont. 270, 384 P.2d 273; State Highway Comm'n v. Keneally, 142 Mont. 256, 384 P.2d 770. All of these cases concerned valuation of leasehold estates, and all concerned service station leases, except Crow.

California courts have construed that state's equivalent of section 93-9912(5), R.C.M. 1947, as requiring a bifurcated trial with the jury first deciding the total value of the property being taken; then, in a separate proceeding, the jury, or a second jury, apportioning the award among the parties. People v. Lynbar, Inc., 62 Cal.Rptr. 320, 326, 253 Cal.App.2d 870; Redevelopment Agency of City of Fresno v. Penzner, 87 Cal.Rptr. 183, 8 Cal.App.3d 417. On the other hand, California courts recognize the statutory provision is entirely "procedural and nonsubstantive." People v. Lynbar, Inc., supra.

The Montana procedural rule has developed, through 14 years of usage, different from that developed by California courts. We will not overturn the developed Montana rule unless prejudice is shown by the parties.

The procedural requirements of section 93-9912(5), R.C.M. 1947, have been liberally implemented, as in City Service Co., where the jury did not first decide the whole compensation due before apportioning the award. In City Service Co. the Court stated:

> " * * * We think it is clear that the awards given
> by the jury (even though listed separately, and,
> thus, error according to the State) were not ex-
> cessive, are supported by substantial evidence,
> and do not reflect an increase in valuation due
> solely to a distribution in title. To send this
> case back for a new trial simply because the jury
> did not first express the damage in one sum would
> be the height of shortsightedness and an utter
> waste of time."

In the instant case, the jury did determine a total award, thereafter apportioning the award among the parties. The award was supported by the evidence and does not appear excessive. The State does not show prejudice due to the procedure used in the district court.

The jury was properly admonished to first ascertain the entire award as though the property were owned by one person, then to apportion this sum among the parties. This Court has repeatedly indicated that it "will presume that the jury, in reaching its verdict, followed the instructions that were given to it by the trial judge." Staggers v. U.S.F. & G. Co., 159 Mont. 254, 259, 496 P.2d 1161; Welsh v. Roehm, 125 Mont. 517, 241 P.2d 816.

The State argues evidence as to the value of the leasehold estate must not be introduced prior to ascertaining a value for the property, under the undivided fee rule, therefore a bifurcated trial must occur to exclude such evidence from the consideration of the jury in arriving at the total value of the property as though owned by one person. The jury was instructed in the undivided fee rule, which governs this case, but the rule does not prevent introduction of evidence as to the value of the whole. The rationale for admitting such evidence prior to the determination of total value, is well stated by the California court in People v. Lynbar, Inc., 62 Cal.Rptr. 320, 328:

> "In this state, as is generally true elsewhere, the constitutional requirement of just compensation for the taking of property in eminent domain is normally satisfied by the payment by the condemnor to the condemnee of the market value of the property taken. This market value is the highest price which the property would bring, if exposed for sale in the open market by a willing seller to a willing buyer with both parties to the transaction being fully informed of all the uses and purposes to which the property is reasonably adaptable and available. * * * to arrive at this value one must take into consideration all those things upon which

- 7 -

> such parties, dealing with each other in the open
> market, would reasonably rely. * * * For this
> purpose the property, together with all of its com-
> pensable attributes, must be valued as the condem-
> nor finds it, including without limitation thereby,
> the state of its title, and in this case, the * * *
> leasehold. * * * We say this because this very
> valuable leasehold is one of the things which such
> a buyer and seller would consider in the open mar-
> ket in fixing the price at which the ownership of
> the property would be transferred. To say that the
> existence of such a lease should be ignored by
> resorting to the legal fiction and legal pretense
> of a single owner is to ignore the realities of the
> market place. If compensation is to be just and
> if the property owner is to be made whole for the
> involuntary loss of his property to the state, this
> cannot be permitted to happen."

As Mr. Justice Holmes said in Boston Chamber of Commerce
v. Boston, 217 U.S. 189, 30 S.Ct. 459, 54 L.Ed. 725, 727:

> " * * * And the question is, What has the owner
> lost? not, What has the taker gained?"

In its second issue, the State questions the use of the
income capitalization method to compute the value of the property
being taken.

The State alleges the Lessee's source of income principally
came from selling products to the person actually conducting
business on the property as the sublessee. The evidence indicates
otherwise. The Lessee realized income due to its control of the
property under the lease and control of the flow of products to
the station operator pursuant to the sublease. The Lessee also
received rental based on the gallons of gasoline sold at the
station. Without the lease, the Lessee could not have controlled
the flow of gasoline, tires, batteries and accessories to the
station. If the relationship of the Lessee to the station operator
was merely as a supplier, the operator could go elsewhere for
products, if he did not wish to deal exclusively with Lessee.
In this case, the Lessee had the right to terminate the sublease,
if the operator sold any products not approved and/or supplied
by Lessee. This profitable legal right was terminated by the
taking of this property.

The use of the capitalized income approach to valuation is appropriate in this instance. At trial, the alternative methods of valuation were discussed. Reproduction cost was rejected by all appraisers as inapplicable. The comparable sales approach was questioned when the State could not present truly comparable recent sales.

As stated in State Highway Comm'n v. Bennett, 162 Mont. 386, 390, 513 P.2d 5:

> "It has been generally held that the best method of arriving at market value is recent sales of comparable property. * * * But where there are no comparable sales, evidence based upon revenue and valuation based in part thereon is competent and admissible."

When the income capitalization method entails less conjecture and uncertainty than alternative methods, it is the appropriate valuation method, with appropriateness necessarily hinging on the facts of the case being tried. State Department of Highways v. Olsen, ____Mont.____, 531 P.2d 1330, 32 St.Rep. 110. In the instant case, the income capitalization approach proved preferable, resulting in an award which was reasonable in light of the record. There was no error on the part of the district court in permitting valuation by this method.

We find section 93-9912(5), R.C.M. 1947, does not require a bifurcated trial in eminent domain proceedings. The income capitalization method of valuation is permissible in a proceeding such as this, when it provides for the least conjecture and uncertainty. Interest on condemnation awards runs from the date of the order of possession of the property to the State.

The order and judgment of the district court is affirmed, with the exception of the provision for interest on the award, which shall be changed as directed in this opinion.

_____
Chief Justice

We concur:

_Wesley Castles_

_Frank I. Haswell_

_____

_____
  Justices